# Exhibit A

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

PLAZA CONSTRUCTION GROUP
FLORIDA, LLC,

       Plaintiff,

v.

PRH NE 31ST STREET, LLC,

       Defendant.

_____/

## COMPLAINT

Plaintiff, PLAZA CONSTRUCTION GROUP FLORIDA, LLC (hereinafter "Plaza"), by and through its undersigned counsel, files this Complaint against Defendant, PRH NE 31ST STREET, LLC ("PRH"), and alleges:

## NATURE OF THE CASE

1.    This is an action for damages in excess of $5,000,000, exclusive of costs, prejudgment interest and attorneys' fees.

2.    This action arises out of the Paraiso Bay construction project ("Project"), which comprises construction of a 53-story condominium tower, including an amenities level on the 5th Floor, a five-story parking garage structure adjacent to this tower upon which the pool deck is located, the foundation shared by the garage and portions of another, adjacent tower, and a series of eight townhomes near the garage structure.

3.    Plaza seeks compensation for substantial extra work that PRH, the Project owner, directed Plaza to perform, as well as massive and extensive impacts for which PRH is responsible.

1

These impacts fundamentally changed the nature of the Project, and include, but are not limited to: directives by PRH to perform enormous amounts of extra work; substantial delays, disruptions and impacts caused by PRH's extensive changes and defective design; PRH's failure to recognize and grant extensions of time to which Plaza is entitled; PRH's failure to compensate Plaza as required by the Contract for extra work Plaza performed and impacts Plaza suffered; and PRH's systemic failure to administer the Project in good faith; all of which rise to the level of active interference on the part of PRH.

4.      The impacts suffered by Plaza have been severe and pervasive, affecting virtually every area of the Project, from the Project's inception (in November 2014) through the present. PRH's constant issuance of changes to the Project work caused massive impacts to construction. The sheer volume of changes was compounded by their late issuance, which often resulted in tearing out completed work to implement the PRH-directed change. Moreover, PRH's designs were often defective, or were rendered incompatible by the never-ending issuance of changes, resulting in even more delays as PRH again revised its design to resolve the conflicts and errors.

5.      The cumulative and compounding effects of these impacts have resulted in immense disruptions, losses of efficiency and severe delays to the Project. Despite Plaza's extensive efforts to minimize and, where possible, eliminate PRH-caused impacts, PRH is responsible for more than 310 days of delay to the Project.

6.      As of the date of this filing, PRH has not granted Plaza a single day of extension of time to the original Substantial Completion Date of January 19, 2017 to account for PRH's delays; nor has PRH compensated Plaza for the extended general conditions costs, extended general requirements costs, or expanded overhead costs it has incurred as a result of PRH's delays to the

2

Project. The only time extension granted was five (5) days for weather days that impacted the Project, resulting in the current Substantial Completion date of January 24, 2017.

7.      Plaza's initial requests for extensions of time were submitted to PRH during the course of the Project.  PRH failed to reasonably and timely address Plaza's requests for extensions of time and failed to grant an extension of the substantial completion date.

8.      Notwithstanding the colossal delays, disruptions and impacts, as well as the severe financial hardships PRH has caused and/or imposed on Plaza, Plaza has diligently pursued the completion of the Project, all while being forced to essentially finance the Project. Despite these challenges, Plaza anticipates substantially completing the Project on or before November 30, 2017, subject to any further impacts by PRH.

<u>**PARTIES, JURISDICTION AND VENUE**</u>

9.      Plaza is a certified general contractor and is authorized to do business in the state of Florida, with its principal place of business in Miami-Dade County, Florida.

10.     PRH is a limited liability company organized and existing under the laws of the state of Florida, with its principal place of business in Miami-Dade County, Florida.

11.     Venue is proper in Miami-Dade County, Florida because the construction project that is the subject matter of this action is in Miami-Dade County, Florida and all material acts giving rise to this action occurred in Miami-Dade County, Florida. Additionally, Section 21.7 of the Contract between the parties specifies that disputes thereunder may be referred to a court of competent jurisdiction in Miami-Dade County, Florida.

12.     All conditions precedent to maintaining this action have occurred, been satisfied or been waived.

## GENERAL ALLEGATIONS

### I.   BACKGROUND OF PLAZA'S CLAIMS

13.   In November 2014, PRH and Plaza executed the Contract for construction of the Project. A copy of limited excerpts of the Contract is attached as Exhibit "A." The Contract, with all incorporated attachments, referenced documents and subsequent modifications, is extremely voluminous and is in the possession, custody or control of PRH. Therefore, only limited portions of the Contract have been attached to this Complaint.

14.   The Contract provided a Guaranteed Maximum Price for the work of $115,095,533. The Contract originally required Plaza to achieve Substantial Completion of the Work by January 19, 2017, with Final Completion being achieved 60 days thereafter.

15.   The Project involves construction of a 53-story condominium tower ("Tower I"), including an amenities level on the 5th Floor, a five-story parking garage structure adjacent to Tower I ("Garage") upon which the pool deck is located, the foundation shared by the Garage and portions of the adjacent tower ("Tower II" or "Gran Paraiso") (Although connected to Tower I, Tower II is not included in Plaza's scope of work under the Contract.  Tower II is a separate condominium building that PRH's affiliate also retained Plaza to construct under a separate contract, which was executed approximately one year and nine months after the Contract for the Project was executed), and a series of eight Bayhomes near the Garage structure.



16.     The agreed Commencement Date for Plaza's work on the Project was September 2, 2014. Accordingly, the original Substantial Completion deadline was January 19, 2017.

17.     Unfortunately, the impacts for which PRH is responsible started at the Project's start in November 2014 and have continued through the filing of this Complaint. PRH's impacts to Plaza's work have been severe and pervasive, permeating virtually every aspect of the Project. These issues have impacted, disrupted and delayed the Project, fundamentally changing the work. Examples of PRH's impacts include, among others: PRH's failure to provide necessary Project access; directives to perform massive amounts of extra work; PRH's issuance of belated, incomplete design changes; PRH's issuance of defective, conflicting design documents; and PRH's systemic failure to administer the Project in good faith.

18.     By way of example, PRH issued thirteen (13) major design revisions within the first nineteen (19) months of construction (through May 12, 2016), including Addenda 3 and 4, and Revisions A through L. These design revisions implemented massive changes to several aspects of the Project work.

19.     The staggering amount of design revisions issued from the start of the Project reflects that the design provided by PRH was incomplete and that PRH's designers essentially

designed the Project as construction progressed. This uncoordinated and inappropriate manner of designing the Project resulted in an inordinate amount of design conflicts and defects, which required significant time to identify and remedy. Although the design of the Project is PRH's responsibility, PRH has forced Plaza to bear the burden of its incomplete / defective design by forcing Plaza to finance the cost of these design changes, by refusing to approve and timely pay Plaza for these changes, and by refusing to grant Plaza the time extensions to which it is entitled.

20.     Although PRH has directed changes in various ways, it has primarily issued changes via Change Directives ("CCDs") and Change Orders ("OCOs").

21.     The Contract defines CCDs as follows:

1.2.7 Change Directive - A written statement to Contractor from, and signed by, PRH. . . ordering a change in the Work prior to agreement on adjustment, if any, in the Guaranteed Maximum Price (as defined below) or the Contract Time (as defined herein), or both. A Change Directive will not, and shall not, adjust the Guaranteed Maximum Price or the Contract Time, but is evidence that the Parties expect that the change in the Work ordered and documented by a Change Directive shall be incorporated in a subsequently issued Change Order following agreement by the Parties as to its effect, if any, on the Guaranteed Maximum Price and/or the Contract Time.

22.     The Contract defines OCOs as follows:

1.2.8 Change Order - A document. . . that is signed by Contractor and PRH. . . which authorizes a change in the Work or an adjustment in the Guaranteed Maximum Price and/or an adjustment of the Contract Time.

23.     In practice, PRH has routinely refused to issue OCOs because PRH improperly refuses to provide any relief to Plaza in the form of an extension of time. Moreover, PRH makes no good faith effort to reach an "agreement" with Plaza on the price and time component of these changes, as contemplated by the Contract.

24.     To date, PRH has issued 140 CCDs and has executed 120 OCOs. Despite these numerous changes, PRH has failed to grant a single day of time extension for all of the changes

PRH has directed. Compounding this, PRH refuses to execute OCOs that contain <u>any</u> time-related component for the changes to the work it directs. At various times, PRH has even refused to execute OCOs because Plaza simply included a reservation of its rights to seek an extension of time for the changes that were the subject of the OCOs.

25.     In short, PRH has administered the Project with complete disregard for the accuracy and completeness of its design, the massive changes PRH directed or the resulting impacts to the Project schedule, and it has correspondingly done all it can to hinder Plaza from obtaining redress for the impacts PRH has caused.

26.     While the Contract contemplates changes to the Work, PRH has utilized the CCD process as another means of causing injury to Plaza. PRH has misused the Contract change provisions by refusing to sign changes that include a time component and by refusing to pay for changes to the Work altogether for months at a time. This course of conduct by PRH resulted in Plaza (and its subcontractors) being forced to finance millions of dollars of directed extra work – upwards of $15 million at the height of the issue – for months at a time. Plaza has also been forced to fully finance its general conditions costs from January 2017 (the date that Plaza's lump sum general conditions costs expired) to date.

27.     Notably, in the post-Contract substantial completion date period alone (after January 24, 2017), PRH has issued another fifty-four (54) CCDs (so far), in addition to several other design revisions made via Request for Information ("RFI") responses or sketches – all of which have occurred <u>after</u> the current Project Substantial Completion date.

28.     Compounding the sheer volume and frequency of the design changes to the Project has been the failure of PRH's designers to timely complete and coordinate their own design. This Project has been plagued by late issuance of design packages, typically issued in piecemeal fashion

so that Plaza does not have the complete scope of work; design errors, omissions and conflicts; followed by never-ending revisions of the design (again, often in piecemeal fashion).

29.     PRH's lack of a complete, cohesive, error-free design is evidenced by the fact that PRH is still directing changes and resolving design errors to this day, which is months <u>after</u> the current contractual Substantial Completion date

30.     In addition to improperly denying Plaza an adjustment to the Substantial Completion date, PRH has asserted that it intends to improperly assess liquidated damages for the delays it has caused to the Project.

31.     As will be addressed in more detail below, the challenges encountered by Plaza, and for which PRH is responsible, were severe and pervasive. These PRH-caused impacts have, so far, resulted in over ten (10) months of delay to the Project schedule, which PRH refuses to address or recognize.

32.     Plaza has mitigated these impacts, delays and disruptions to the extent practicable, but the effect on Plaza has been extreme.

## II.   PLAZA'S PLAN FOR THE WORK

33.     Plaza's plan for construction has been greatly impacted by PRH's ongoing changes to the design and the Project work.

34.     With respect to Tower I, Plaza intended (and the contract price and original progress schedule anticipated) to complete the work in a linear, floor-by-floor manner – meaning all the work for a certain activity would be completed for all units on a floor before the work crews could proceed to the next floor. This floor-by-floor sequence maximized efficiency of the crews and minimized time lost to moving crews and equipment between floors.  Moreover, Plaza's GMP included a fixed estimate of its general conditions and general requirements costs based upon the

contractual duration agreed to in the Contract, which duration has been exceeded by at least ten (10) months due to PRH's defaults more fully described herein.

35.     Early in the Project, Plaza also planned to begin construction on the portions of Tower II that are included in its Contract for this Project. This includes portions of the Tower II foundation that are shared with the Garage, and portions of the first two floors of Tower II that contain the Florida Power & Light (FPL) power vault.

36.     After completing the Tower II foundation, Plaza would proceed with the foundation for the Garage structure. Plaza's plan was based on the contractual stipulation that PRH would arrange for N.E. 31st Street to be closed no later than April 2, 2015, in order to provide Plaza access to the Project site. The Garage was to be built in three sections – beginning from the north, and progressing through the middle section. Construction of the south section would occur last.

37.     Once the shared foundation of the Garage and Tower II was completed, work could begin on the five-story Garage structure, culminating with the pool deck on the top level.

38.     Despite Plaza's work plan, and the construction schedule based thereon, PRH directed changes to nearly every part of the work as it belatedly developed the design for the Project or to remedy conflicts and errors in the designs it previously issued. PRH's course of conduct demonstrates its design was not ready for construction.

39.     Plaza has kept PRH appraised of the impacts to the Project resulting from its myriad, belated changes and failures to administer the Project in good faith through various meetings with Project level and executive personnel, in email communications, in monthly schedule updates, and in the submission of Time Impact Analyses ("TIA's"), which specifically establish Plaza's entitlement to additional time and additional compensation for general conditions and general requirements costs associated with the delays.

### III.   MAJOR IMPACTS AND DELAYS

40.     Plaza has been impacted and delayed by numerous events and issues for which PRH is responsible. The issues that are described below are merely examples of some of the major impacts and/or delay-causing events on the Project.

*A.  Early delays - Delays to Garage Structure / Foundation*

41.     As a result of PRH's failures to comply with the requirements of the Contract, Plaza's Work on the Garage was severely delayed from early in the Project.

**i.    31st Street Closure / Sales Center**

42.     As discussed above, Plaza planned to construct the Garage in three phases, working from north to south, as depicted below.



43.     In order to access this area of the Project, PRH was to arrange for key road closures. Access to these areas was necessary to permit Plaza to perform the work in the time indicated on

the Project schedule and in the manner on which that schedule was based. A layout of the work is below. The red area reflects the portion of Tower II that is included in the Contract, and the yellow area reflects the footprint of the Garage structure. As may be seen below, 31st Street runs right through this area of the work.



44.     In addition to building the Garage structure, Plaza was to construct certain parts of Tower II located just west of, and sharing some of the foundation with, the Garage. Included under the Contract were all 24-inch diameter Augercast piles (ACPs), which form part of the structure's foundation, the concrete foundation mat and pile caps for Tower II, and the southeast part of Tower II, which would contain the FPL vault (on the first level) and the switchgear room (on the second level). The plan was to install all the ACPs early in the Project, install the sheet piles enclosing the concrete mat and most of the remaining pile caps, excavate, cut the ACPs, build the 3,000-cy concrete mat and remaining pile caps, and remove the sheet pile wall. This Tower II work was

planned to be completed before starting the foundation work for the Garage, since the removal of the sheet piles was necessary to build the 1st Level deck of the Garage.

45.     Plaza based its construction plan and Schedule for this work on certain contractual stipulations. Exhibit G of the Contract sets forth Plaza's Qualifications and Assumptions, to which PRH expressly agreed by including them in the Contract. Item 15 includes the contractual stipulation that N.E. 31st Street would be closed no later than April 1, 2015:

> The GMP assumes that there will be unobstructed access to the Project at all times with the exception of N.E. 31st Street. The GMP schedule allows N.E. 31st Street to remain open to the public / PRH's sales center until April 1st, 2015. Plaza and PRH agree to review the GMP CPM schedule not later than February 16, 2015 to determine the overall cost / time impact (if any) to Plaza should PRH desire to keep N.E. 31st Street open beyond April 1st, 2015.

46.     In order to avoid any Schedule impacts, Plaza sent an email on February 17, 2015 to PRH warning that if the 31st Street closure was delayed beyond June 25, 2015, the work on the Garage and Tower II/Gran Paraiso would also be delayed. The email further warned that this scope of work would become concurrent with the work on Tower I, which was the critical path of the Project at that time.

47.     This advance warning, and identification of the extended June 25, 2015 deadline, provided PRH with nearly three (3) additional months to relocate its Sales Center and obtain the required City Permit before the 31st Street closure began to impact Substantial Completion of the Project.

48.     Unfortunately, PRH failed to secure timely closure of 31st Street. On July 20, 2015, as a consequence of PRH's failure to close 31st Street by even the extended deadline of June 25, PRH directed Plaza to completely revise the initial construction plan and re-sequence the Garage construction in an attempt to mitigate PRH's delay.

49.     Under this re-sequenced plan, rather than constructing the garage from north to south, construction was to start on the south and middle sections, followed by construction of the north section, as depicted below.



50.     Ultimately, PRH failed to close 31st Street until October 1, 2015, over six (6) months after the contractually-required date and over three (3) months after the extended deadline.

51.     In an effort to mitigate the severely late road closure, the ACP subcontractor was able to start the work on the Garage on August 13, 2015; however, only a very small number of ACPs could be installed with the lack of access caused by 31st Street remaining open. In continued mitigation efforts, the ACP subcontractor worked in any available areas, hopscotching around, rather than proceeding in a linear, sequential and efficient manner.

52.     The north section of the Garage was further delayed, even after the closure of 31st Street, because of a design conflict (existing water main). Specifically, the existing water main,

which provides fire protection to the Paraiso Bay campus, conflicted with the designer-specified location of the remaining ACPs for the north section of the Garage.

53.     In order to remove the conflicting water main, PRH had to obtain approval from the Water and Sewer Department to construct and activate a new water main. It was not until November 20, 2015 that PRH confirmed the existing water main could be cut and plugged. This finally allowed Plaza to remobilize and complete the piling along 31st Street for the north section of the Garage.

54.     In addition to the above, two further problems occurred at each end of the Garage structure that prevented Plaza from using the staging areas it relied on in its original construction plan. On the east side of the Garage structure, PRH moved the location of its Sale Center fence to the west of its original placement, and as a consequence, Plaza was prevented from using the 7th Ave area that was planned for staging materials needed for construction. This impacted the sequence of construction and area available to work because the materials had to be staged in other areas.

55.     On the west side of the Garage, the construction of the Tower II foundation was delayed due to PRH's redesign of that tower, as discussed below, which prevented Plaza from using the northern area of Tower II as a second staging area. As a result, Plaza was forced to use the north section of the Garage for staging, rather than having that area available for construction, which further impacted that work.

56.     These issues related to construction of the Garage / Tower II foundation were contrary to the express language of the Contract, which states that Plaza will have unobstructed access to the site at all times.

57.     PRH's failure to close 31st street as stipulated in the Contract, and as necessitated by the Project Schedule, greatly impacted Plaza's plan for the work, resulted in a shift of the critical path, and caused significant delays to the Project that Plaza was not able to overcome.

58.     Despite PRH's clear responsibility for the numerous impacts in this area, it has refused to acknowledge even one day of delay associated with the belated (six months) closure of 31st Street.

    **ii.**   **Tower II Foundation Redesign**

59.     In early 2015, a few months into the Project, PRH notified Plaza that PRH's affiliate was in the process of redesigning Tower II/Gran Paraiso. This redesign included design modifications to the Augercast piles and the mat and pile cap foundations that were included in the Paraiso Bay Contract. As a consequence, the construction of this work and successor activities was put on hold, awaiting further details from PRH regarding this change.

60.     Several months later, on August 10, 2015, PRH issued Gran Paraiso CCD #001, which provided additional drawings for the ACPs for Tower II. Importantly, however, the CCD did not provide all revised drawings – it was limited to only the ACPs.

61.     Accordingly, while this CCD would allow installation of ACPs, it would <u>not</u> permit Plaza to start construction of the mat and/or pile caps, which were a key part of the Tower II foundation. As a result, Plaza was prevented from completing multiple major scopes of work affected thereby, including the Tower II foundations, Garage foundations, and the Tower II FPL vault.  Though it was located under Tower II, the Tower II FPL vault was necessary for the Paraiso Bay tower (Tower I) as permanent power to Tower I would be supplied through the Gran Paraiso FPL vault.

62.     The mat and pile cap design was transmitted by PRH, via Gran Paraiso CCD #002, two months later, on October 14, 2015. This information finally allowed Plaza to prepare the necessary shop drawings, procure the reinforcing steel, and in parallel, to mobilize the dewatering equipment and start the excavation for the Tower II mat and pile caps.

63.     Plaza's original schedule reflected pouring the mat foundation on March 17, 2015. However, due to the above, the mat foundation did not pour until February 11, 2016 – nearly a full year after Plaza intended to begin this work. This delay is wholly attributable to PRH's design change and failure to timely provide Plaza with a complete redesign on which it could proceed with construction.

64.     Plaza's original plan for construction reflected completion of Tower II foundation prior to starting work on the Garage. PRH-caused delays to Tower II, however, resulted in Plaza constructing the Tower II and Garage foundations simultaneously.

65.     This prevented the elevated deck for the south and middle sections of the Garage from being built as fast as shown on the schedule. Simply put, delaying construction of the Tower II foundation for nearly a year had a significant impact on Plaza's ability to construct the Garage.

### iii.    Stair #4 Foundation

66.     Along with the foundation delay on the west side of the Garage due to the redesign of Tower II, the foundation work was also delayed on the east side of the Garage due to PRH's redesign of the Stair #4 foundation. This redesign affected more than just the Garage, since the Stair #4 foundation deep excavation and sheet piling prevented other adjacent foundations from being installed.

67.     When PRH provided the redesign to Plaza, the foundation details for the Bayhomes structure were missing. Shortly thereafter, on September 4, 2015, PRH notified Plaza that the Stair #4 pile cap was going to be modified.

68.     This stairwell is located within the south section of the Garage structure, and because the south end of the Garage was the first section constructed, as a result of re-sequencing the work due to PRH's failure to close 31st Street, this pile cap redesign prevented construction of the south section of the Garage from starting.

69.     On October 2, 2015, PRH provided a structural sketch (SSK 015) with a revised Stair #4 foundation design. On October 9, 2015, Plaza requested clear direction from PRH as to what design to use for construction, and on October 14, 2015, PRH issued Revision H, finalizing the modifications to Stair #4 and the Bayhomes foundation caps.

70.     However, on October 23, 2015, an additional delay occurred on the Stair #4 foundation cap. Unforeseen conditions, related to soil quality, resulted in an additional five (5) days of delay. Upon excavation for the sheetpiling, it was revealed that the soil quality was not as represented in the geotechnical report provided by PRH. Excavation of the area in the manner Plaza planned based on the geotechnical report resulted in shifting of the sheetpiling, due to increased pressure on the sheets. Plaza reported the unforeseen condition in a letter to PRH. A solution to the issue was not reached until October 28, 2015, and work re-commenced on October 29, 2015.

71.     In order to address the soil conditions, Plaza was forced to excavate outside of the sheetpiles to reduce the load on them and prevent further shifting. This manner of excavation was more difficult and more time consuming than Plaza's original plan for construction.

72.     Through the PRH-caused delays discussed above, the Project was delayed a total of 88 calendar days. At this early stage in the Project, impacts for what PRH was responsible had already extended the projected Substantial Completion Date to April 17, 2017.

### B.   Delays to Tower I – Amenities and Residential Units

#### i.   Tower I Units

73.     After the early-Project delays discussed above, PRH caused even more Project delays, this time relating to the Tower I Units. PRH directed massive, piecemeal changes that affected nearly every unit on every floor of the Tower. These changes affected framing, equipment and fixture placement, mechanical and piping runs, servicing equipment / fixtures, exterior glazing, and a number of finishes.

74.     These changes were often issued after Plaza had completed its work on the affected units, resulting in substantial amounts of wasted time and materials, as Plaza had to revisit completed units to tear out completed work in order to implement PRH's revised designs. This forced Plaza to rip out previously-installed work, make changes, and refinish the area.

75.     When superficially viewed in isolation, the individual changes may not seem significant. However, the widespread, piecemeal changes to multiple units on many, if not all, floors caused significant delays and prevented Plaza from completing the work in the efficient, linear, floor-by-floor manner on which it based the Project schedule.

76.     The following are examples of the Tower I unit changes directed by PRH:

a.   Unit 8 Redesign

77.     In the original Contract drawings, the Unit 8 air conditioning unit was located in the master bedroom closet. On September 25, 2015, PRH issued CCD #25, which changed the location of the air conditioning units of Unit 8 from floors 6 through 49. CCD #25 directed Plaza

18

to relocate the risers and place the air conditioning units in the ceilings of Unit 8 on floors 6 through 22 and to install a single air conditioning unit in the living room of Unit 8 for floors 23 to 49.

78.     On October 7, 2015, PRH issued CCD #25R l, modifying this work; however, Plaza was unable to proceed with the work included in CCD #25R l due to conflicting information on the mechanical sketches and a lack of structural details associated with these changes.

79.     At the time CCD #25R l was issued, Plaza had already poured the concrete post-tensioned slabs for floors 6 through 24 of the Tower structure. Changing the location of the air conditioner required Plaza to go back to completed floors and modify the concrete slabs to accommodate the piping and sleeves associated with the relocated air conditioning unit. This process required x-raying the slab to identify conflicts with existing PT cables in the proposed locations, coring and chipping to remove concrete where the new sleeves were to be placed, and finally, filling-in the old sleeve locations.

80.     In early 2016, Plaza began the process of modifying the completed slabs on floors 6 through 24 to accommodate the revised location of the air conditioning units. During the x-ray process, it was discovered that the proposed locations for the sleeves conflicted with existing PT cables and the design could not be implemented. Ultimately, this resulted in further modification of the sleeve locations.

81.     On February 12, 2016, PRH directed Plaza, via email, to stop the core drilling process, as further potential design conflicts had been identified.

82.     PRH then changed the design back to the previous design issued in CCD #25R1. This change back to the CCD #25R1 design rendered the coring and chipping already undertaken by Plaza (to address the PT cable conflicts) completely unnecessary.

83.     It was not until March 15, 2016 that the final information was provided and Plaza was released to restart this work. The back-and-forth redesigns affected Unit 8 on approximately twenty floors.

b.   Unit Tile Upgrades

84.     With regard to unit tile, the original allowance in the Contract only required Plaza to furnish and install the bathroom tile, base, and tub splash, deck and skirt. Floor finishes for the remainder of the units were to be decided by the individual unit owners and were not in Plaza's scope of work.

85.     In May 2015, PRH directed Plaza to install full tile in a number of upgraded units. This additional scope of work affected 93 units, totaling nearly 25% of the total units in the Tower, and affecting units on 43 different floors.

86.     Separately, nearly eight (8) months later, on February 5, 2016, PRH issued CCD #46, directing Plaza to furnish and install additional baseboards at all Units receiving tile upgrades. These baseboards were not previously Plaza's responsibility and this newly-directed work was not included in Plaza's schedule. Again, this affected nearly 25% of the Tower I units.

87.     Adding to these new scopes of work, Plaza was again directed by PRH to install additional materials related to the tile work. On February 19, 2016, Plaza received an email from PRH directing Plaza to install waterproofing on the balcony of all upgraded tile units, which was not previously part of Plaza's scope of work.

88.     These additional scopes of work caused delays to the completion of the Tower units. None of this PRH-directed additional work was contemplated by the original Contract or construction schedule. This additional work also required Plaza to divert resources from other

work, stack trades / resources and disrupted Plaza's ability to perform the work in the linear sequence it originally planned.

          c.   <u>Pocket Doors</u>

89.     On November 19, 2015, PRH issued CCD #37, which modified the width of the pocket door in the master bedroom of Units 1 – 6 from 3 feet to 4 feet. This CCD was further revised on March 2, 2016, and ultimately required seven (7) mockups over a period of several months to finalize what PRH wanted.

90.     The frames for the modified pocket doors arrived on April 15, 2016.

91.     The modification of the pocket doors required Plaza to tear out completed drywall and reframe the openings in order to accommodate the increased door size. At the time PRH issued the change, the framing and drywall for these doors was already completed in Units 1 to 6, from floor 6 to approximately floor 23.

92.     This change also required modification of plumbing stub-ups and other electrical work that was located within the affected walls. This means that in over 100 units, Plaza had to go back and tear out completed work in order to implement the change.

          d.   <u>Combined Units</u>

93.     The Contract's Qualifications and Assumptions, Division 1, item 10 of the Contract states that PRH will prohibit buyers from making any changes to the units during construction and prior to Substantial Completion.

94.     Contrary to the Contract's stipulations, PRH allowed buyers to combine or modify at least ten (10) units. Moreover, these changes were issued in piecemeal fashion. The incomplete designs issued by PRH prevented Plaza from implementing these improper changes, in some cases, for several weeks.

95.     For example, PRH issued CCD #16 on August 18, 2015, which provided architectural drawings related to combining Units 1204 and 1205. Over a month later, on September 25, 2015, PRH issued CCD #23, which provided the mechanical drawings for this alteration to the units.

96.     Similarly, PRH issued Revision H on October 8, 2015. In addition to other changes, Revision H provided architectural drawings for combining Units 4806 and 4807. Over a month later, on November 24, 2015, PRH issued CCD #41, which provided the mechanical drawings for combined Units 4806 and 4807.

97.     In addition to allowing buyers to combine multiple units, PRH also permitted buyers to modify the floorplan of single units. As an example, CCD #53, issued on March 18, 2016, directed Plaza to make modifications to the layout of Unit 4201, including deletion of the master bedroom and alterations to the layout of the second bathroom. Likewise, Revision J, issued on February 1, 2016, modified the floorplan of Unit 5201. PRH also permitted miscellaneous changes to Units 5202, UPH 1, UPH 2 and UPH 3.

e.   Vanity Relocation

98.     The original Contract drawings called for a pocket door for the master bathroom in Units 1-6, on the 6th through 22nd floors.

99.     PRH issued design Revision A, which changed the door from a pocket door to a pre-hung swinging door. Both the original Contract drawings and Revision A drawings reflected that the door casing was not in conflict with the bathroom countertop or vanity.

100.    After approval of submittals from Plaza, the cabinets, vanity countertops, pre-hung doors and casings were released for fabrication, and Plaza's subcontractor began framing the bathrooms in preparation for installation of the pre-hung doors.

101.    Through the installation, Plaza discovered a conflict. On October 7, 2015, Plaza raised the conflict between the casing for the pre-hung doors and the bathroom vanity countertop. The issue was repeatedly raised by Plaza in at least five coordination meetings. Each time, PRH and its Architect denied the existence of a conflict and advised that the cabinets and casings would fit as designed.

102.    As a result of the Architect's refusal to acknowledge the conflict, Plaza issued RFI #418 on January 13, 2016. RFI #418 contained a picture of the actual installation of the work and demonstrated the overlap between the door casing and the vanity countertops.

103.    PRH's Architect, finally realizing the design error, proceeded to issue three different solutions in responses to RFI #418 over a period of days, culminating in PRH / PRH's Architect directing Plaza to reposition the vanity in the center of the wall, rather than in the corner where it was then located.

104.    The direction to relocate the bathroom vanity was issued _after_ Plaza had commenced this work; drywall was hung and walls were closed in many of the affected units. This change resulted in the tear out of completed work and required significant modification to finished walls.

105.    Moreover, Plaza had to alter in-wall and overhead electrical and HVAC rough-in, and plumbing in order to align light fixtures, wall outlets and plumbing pipes with the new location of the bathroom fixtures.

106.    The issuance of a defective design coupled with the obstinate denial of Plaza's concerns regarding this conflict significantly impacted the completion of Contract work and punch list on the affected floors.

23

107.    In total, approximately 144 units, spanning twenty-four floors were affected by this PRH-directed change to resolve the design conflict.

       f.    Vessel Sink

108.    The original Contract drawings called for a vessel sink sitting on a cabinet that, in turn, sat on the floor of the bathroom.

109.    On February 29, 2016, PRH sent an email directing Plaza "to stop install on all vessel sinks."

110.    On March 23, 2016, PRH issued CCD #54 directing Plaza to raise the height of the vessel sink, by constructing a drywall pedestal on which the cabinet and vessel sink would be placed. This change affected Units 1-8 on approximately twenty floors, or approximately 160 units total.

111.    Because this change was directed after cabinets and sinks had already been installed on several floors, for many units, this change resulted in tearing out completed cabinets and sinks in order to construct the pedestal and replace the fixtures and cabinetry.

       g.    Tub Spandrel Glass

112.    The original drawings called for clear glass to be placed in the windows behind the bathtub in Units 7 and 8.

113.    On November 19, 2015, PRH issued CCD #38, which directed Plaza to install half spandrel/half clear glass in the bathtub windows. This directive affected a total of seventy-six (76) units, on forty-three (43) different floors.  By the time CCD #38 was issued, Plaza had already installed the clear glass called for on the original drawings in the relevant units on approximately forty (40) different floors.

114.    Although PRH requested this change in November of 2015, due to an extended lead time for these materials, the new glass needed to complete the work did not arrive until April 4, 2016 – nearly five months later.

115.    The untimely arrival of the window material prevented installation of the bathtubs and delayed completion of the bathrooms in the affected units.

116.    In this regard, Plaza could not proceed with drywall and other work that would be adversely affected by water until the clear glass was removed (in the units where it had previously been installed), the half spandrel/half clear glass was installed and the area was fully dried-in.

117.    This change resulted in Plaza having to disrupt its planned construction sequence and leave units incomplete until the material arrived. Plaza had to then go back to the affected units, install the material and complete the follow-on work.

118.    The combined effect of all the unit changes described above was staggering. PRH's design flaws and changes touched virtually every unit on almost every floor in Tower I. The below is a depiction of the extent of the changes on a typical floor in the Tower. This work was repeated on each of the affected floors. Yet, PRH has not taken responsibility for the impacts to the work resulting from these myriad changes.



### ii.   SSK 17 – Roof Redesign

119.   As a result of PRH-initiated design modifications to the spas in the UPH Units, additional structural support was needed, and the roof design was impacted. SSK 17 was issued by PRH on May 12, 2016, and redesigned the structural framing requirements at the roof level of Tower I.

120.   As a result of this PRH-directed redesign, the entire roof shoring, formwork system, rebar and PT shop drawings had to be revised and re-submitted by Plaza, and re-approved by the Engineer of Record and/or the City before Plaza was able to begin forming the roof slab and ordering needed materials.

121.   Furthermore, this change resulted in a dramatic transformation of the way in which Plaza intended to complete this work. Originally, Plaza intended to use a table formwork system to complete each level of the tower structure. The benefit of the table system is twofold – (1) the tables can simply be moved from floor-to-floor without the need to construct time-intensive

scaffolding at each floor, and (2) when the forms are removed, the surface that remains is smooth and relatively free of debris, resulting almost no effect on subsequent work.

122.    The change initiated by SSK 17 added drop beams to the slab at level 53 of Tower I; the protruding beams in the roof structure prevented the use of the table system and required Plaza to "stick form" the entire level with individual pieces of scaffolding in order to form the multi-faceted surface of the redesigned roof structure.

123.    The construction of the scaffolding was time-intensive and significantly less efficient than Plaza's original plan. In particular, the use of "stick forms" prevented other trades from performing their work.

124.    Moreover, this manner of construction inherently resulted in a concrete surface that was covered in debris and required additional scraping/cleaning prior to work by follow-on trades – a significantly more labor-intensive process than originally planned.

### iii.    5th Floor Amenities

125.    As a result of the severe delays to the Project from the Project's inception, in or about November/December 2016, PRH attempted to develop a plan that would mitigate at least a portion of the delays PRH had caused and would enable PRH to commence closings on the vast majority of Tower I units prior to Substantial Completion of the overall Project.

126.    In order to accomplish this, PRH shifted its focus away from Substantial Completion of the Project and instead focused on the date by which Plaza could achieve a Partial Temporary Certificate of Occupancy (TCO) for the residential units in Tower I.

127.    In an effort to mitigate PRH-caused delays to the Project, and although it was never formally directed by PRH, Plaza agreed to provide the date by which it believed it could obtain a

Partial TCO for the first 49 floors of the Tower and common areas only (excluding the Bayhomes and upper units).

128.     Achieving Partial TCO would enable PRH to close on completed units and receive the proceeds of the sales to individual unit owners. By shifting the focus of discussion from Substantial Completion to Partial TCO, PRH would be able to reap the rewards of millions of dollars in residential sales notwithstanding the delays PRH caused to the Project by failing to provide timely access and a constructible, complete design. This approach was supposed to be a win-win for PRH but again, PRH's incomplete and ever-changing design thwarted the plan.

129.     The 5th Floor of the Tower contains various amenities and leads out to the adjacent pool deck, which is located on the 5th floor of the Garage structure. This area needs to be completed in order to obtain a Partial TCO of units (e.g. the first 49 floors) in the Tower. However, due to significant PRH-directed changes and delays, work in this area of the Project was adversely impacted.

130.     Impacts for which PRH is responsible occurred to the 5th Floor Amenities Level as a result of delays to the windows needed to enclose the 5th floor / allow installation of the area finishes. In addition to the window issue, Plaza encountered significant issues with regard to the issuance of Interior Design drawings and pricing / PRH selection of the finishes for the amenities level. Other numerous, miscellaneous PRH-directed changes also impacted the work in this area.

a.   Windows

131.     In order to complete the 5th Floor Amenities Level, including installation of drywall and various PRH-selected finishes, the space had to be completely enclosed.

132.     The dry-in of this area required that the building shell be enclosed to keep out wind, rain, or moisture; thus, assuring that weather-sensitive materials or work could begin without those

28

materials suffering damage. Plaza was not able to dry-in this space due to PRH-caused delays related to the approval, fabrication, delivery and installation of the windows.

133.     As early as Feb 12, 2015, Plaza submitted the first set of shop drawings for the 5th Floor Amenities level. PRH directed Plaza to provide shop drawings even though the design for this space had not yet been issued by PRH or its Architect.

134.     PRH finally provided details regarding the design of this space, via Interior Design drawings, on December 14, 2015, months after Plaza had begun the approval process for this work.

135.     Due to constant PRH revisions of this space and the belated release of the Interior Design drawings, it ultimately took seven (7) submissions by Plaza before PRH finalized its design and approved the windows.

136.     On May 6, 2016, over a year after Plaza submitted the first shop drawings, the windows were finally released by PRH for fabrication. The windows arrived on site in late July of 2016, and dry-in of the 5th Floor was completed in August of 2016 – over six (6) months after the time for this work in Plaza's original construction schedule.

137.     Once dry-in occurred, Plaza was able to proceed with constructing the interior of this space. Unfortunately, however, further PRH changes delayed this work.

b.   Pricing / Interior Design Drawings

138.     Although the delay associated with the windows for the 5th Floor Amenities is the most significant time impact for this space, Plaza endured other issues for this scope of work.

139.     The original Contract drawings, issued on July 20, 2014, failed to include any detail for the 5th Floor Amenities and simply depicted an empty space for this significant area of the Tower.

140.    Nearly 18 months later, on December 14, 2015, PRH issued Interior Design drawings, depicting details for the layout of this area. This was the first time details regarding this scope were provided to Plaza. However, according to the baseline schedule, these drawings were needed no later than January 20, 2015 in order to prevent impacts to the Project schedule.

141.    Plaza's schedule originally allotted seven (7) months for completion of this work; however, PRH failed to provide the details needed to proceed with pricing this work for a year and a half.

142.    Once the details were provided, Plaza was able to begin pricing the finishes as depicted on the drawings. During its effort to price the belatedly-specified finishes, Plaza discovered that the finishes selected by PRH were grossly over budget, thereby demonstrating that PRH and its designer completed the design with utter disregard for the Project budget PRH established.

143.    The Contract provided PRH with a budget of $1 million for 5th Floor Amenities finishes. In contrast, however, the pricing for this area totaled over $2 million (a full $1 million over the PRH-specified budget).

144.    To remedy the $1 million budget shortfall for PRH-selected finishes, PRH required Plaza to engage in a detailed and time-consuming value engineering (VE) process, through which budget appropriate alternatives were identified as substitutes for the original PRH-selected finishes.

145.    This improper approach by PRH essentially forced Plaza to act as PRH's designer for this portion of the work. These VE efforts were not Plaza's responsibility; PRH and its designer bore full responsibility for this design work. Moreover, the protracted VE process resulted in Plaza

completing the VE process and constructing the space substantially after the time allotted in the original schedule.

c.   Other 5th Floor Changes

146.   In addition to the above, Plaza encountered a litany of other issues with regard to work on the 5th Floor Amenities Level.

147.   *Linear Drains* – In response to RFI 469, PRH directed that six (6) linear drains were to be located at the doors that exit to the pool deck. On, August 27, 2016, Plaza alerted PRH to conflicts between existing PT cables and the new linear drains, and on December 7, 2016, a design defect (code violation) was also discovered for the linear drains. Ultimately, after a significant amount of time and effort was devoted to the issue, on January 9, 2017 (only 15 days before the current Contract Substantial Completion date), PRH reversed course, directing that no linear drains be installed and that Plaza should fill the sleeve openings in the slab created for the drains with concrete. Throughout the whole process, however, Plaza could not install flooring in this area.

148.   *Bathrooms* – From August through November 2016, PRH made changes to the 5th Floor Level bathrooms, including adding toilet glass partitions, changing the bathrooms related to ADA dimensions required for the bathroom vanity tops, and resolving conflicting information with regard to toilet accessories to be used in the bathrooms, among other issues. Through a series of RFIs and email communications, Plaza attempted to clarify these various issues with the bathrooms. As late as December 7, 2016, Plaza was still attempting to get final PRH direction for selection of the bathroom vanities, counter tops and backsplashes.

149.   *Bathroom Tiles* – A similar saga occurred regarding the tiles for the 5th Floor bathrooms. Beginning in late October of 2016, Plaza sought confirmation from PRH that the

bathroom tile for the 5th Floor (an PRH-supplied material) would be delivered by November 2, 2016. Plaza sent repeated requests to PRH requesting confirmation of the delivery date of the tile. When the bathroom tiles were finally delivered over three (3) weeks late, on November 23, 2016, most of the delivered tiles were defective, containing a pitted surface and/or in the wrong color. The correct tiles were finally provided by PRH on January 26, 2017 (two days after the current Contract Substantial Completion deadline).

150.    *Miscellaneous Changes* – PRH made many other changes in the 5th Floor Amenities space. A sampling of which, though others exist, includes:

      a.   On September 29, 2016, PRH issued sketch ASK 71.1, which added a weight room to 5th Floor.

      b.   On September 30, 2016, PRH added a Lutron lighting system to the 5th Floor.

      c.   On October 11, 2016, PRH issued a direction to alter the ceiling in a portion of the 5th Floor to incorporate acoustical ceiling panels.

      d.   On October 31, 2016, PRH issued sketches ASK 74 and SKE 36, which added subwoofers to the screening room on the Amenities Level. Subsequent revisions for these systems were made through November of 2016.

151.    PRH's design for this space was not completed until virtually the end of the original Contract performance period. The effects of this were myriad, ad hoc changes and late deliveries of materials that were essential to Plaza's ability to progress the work and maintain the Project schedule. Moreover, the designs given by PRH's designers were often developed with no regard for the budget PRH established or the lead-time and availability of the chosen materials.

152.    The effect of all these changes was to delay completion of this area, which is needed for both Partial TCO and Substantial Completion.

### C.  *Initial Delays to Bayhomes*

153.  Despite PRH's attempts to shift the focus from Substantial Completion to Partial TCO, as a result of PRH-directed changes, the critical path of the Project schedule shifted to the Bayhomes for a significant portion of the Project.

154.  As with all other portions of the Project, PRH mismanaged the design of the Bayhomes through late revisions and defective design documents.

155.  Despite PRH's failure to properly perform the Contract between the Parties, PRH has yet to take any responsibility for these issues in the form of a time extension to Plaza.

156.  An enormous amount of changes was made to the Bayhomes' interiors between February and April of 2016. PRH issued Revision J on February 8, 2016, Revision K on April 5, 2016, and sketch ASK 50 on April 6, 2016 (revised ASK 50 on April 21, 2016).

157.  Design changes made through Revision K and ASK 50 were issued after the structures of Bayhomes were already under construction based on the design provided in Revision J.

158.  However, the design drawings provided in these subsequent revisions were not coordinated by PRH's designers and omitted critical information needed to allow Plaza to proceed with construction in the field – neither Revision K, nor any of the ASKs issued by PRH at that time, included mechanical, electrical, plumbing, fire protection, fire alarm, low voltage and/or security drawings for the alterations to the Bayhomes.

159.  On April 11, 2016, Plaza sent a Notice to PRH stating:

Structural and MEP coordination cannot properly occur using REV K drawings, as ASK 50 modifies the architectural layouts significantly. The 2nd floor south pour is tentatively scheduled to pour on 4-13-16. CCD 55 was received on 4-5-16 and CCD 56 was received on 4-6-16, with no MEP or structural CAD files. Plaza will make best efforts to mitigate this late issuance of revised drawings.

160.    At that point, the mechanical and fire protection coordination process was stalled and Plaza was forced to suspend coordination for the Bayhomes until further information was provided by PRH.

161.    It was not until Revision L was issued, on May 12, 2016 (only eight months before the current Substantial Completion deadline), that mechanical drawings were re-issued, along with yet further architectural drawing revisions. This finally provided the information needed to begin coordinating the concrete structure with the mechanical drawings, particularly the location of the sleeves in the concrete slabs.

162.    However, in order to mitigate further PRH-caused delays, PRH directed Plaza to continue with the concrete work even before Revision K (or Revision L) was issued.

163.    This delay in issuing mechanical drawings forced Plaza to come back after the concrete work was complete and incorporate the sleeves and other components omitted from the initial design. Substantially departing from the planned (and normal) construction sequence, Plaza was forced to coordinate the sleeves through the already poured concrete slabs in accordance with the mechanical and architectural requirements set forth in Revision L and quantify the remedial work required by the change.

164.    In order to achieve this, the following revised sequence of work had to be performed:

   a.    Remove the re-shoring from the 1st level to the 2nd level;

   b.    Lay-out the as-planned requirements (per Revision L) on the structural slabs of the affected Bayhomes;

   c.    X-ray the locations and adjacent areas required for sleeving to locate the post tensioned cables (PT) and reinforcement installed in the concrete slab;

    d.   Provide information to PRH for review and re-design of the Architectural and MEP layouts to accommodate the PT and rebar;

    e.   Re-x-ray to verify the new locations do not have PT cables, as needed;

    f.   Core / chip holes in the concrete for sleeves; and

    g.   Install sleeves and pour back the concrete.

165.   Once the above work was completed, the overhead mechanical rough-in could commence.  This mechanical work is the first activity that must be performed in the interior of the units in order to proceed with the remainder of the work on the Bayhomes. All Bayhome levels were affected by this issue.

166.   The multiple revisions to the Bayhomes' design late in the Project substantially delayed work on these units and significantly extended the entire Project duration.

167.   Even in light of this clear failure on the part of PRH and its designers, PRH has refused to take any responsibility for the issues caused by its belated and defective designs.

### D.  Delays to Pool Deck

168.   Plaza also experienced significant impacts, for which PRH is responsible, to the pool deck area located on the 5th floor of the Garage. Settlement of the shared Garage / Tower II foundation impacted the Garage, pool deck and the connection of those structures to Tower II. Moreover, PRH's failure to properly address the settlement issue, hallmarked by incomplete and erroneous drawings, and delay in providing clear direction to Plaza on how to proceed, compounded the impacts.

### i.   Level 5 Pool Deck Elevations (CCD #84)

169.   As previously stated, the Garage, the pool deck located on level 5 of the Garage, and the Tower share a common foundation. Any deviation in the amount of settlement projected for either structure would impact the construction of the other.

170.   On June 17, 2016, in anticipation of pouring the Garage slab at the Lobby elevation of the Tower, Plaza raised an issue regarding settlement of the Tower and the potential effect this settlement would have on the interface of the Tower and the Garage.  Specifically, Plaza advised that settlement survey data revealed that the Tower had already settled three inches and that the Tower would be three inches lower than the Garage slab at the 5th Floor Amenities Level. Plaza further requested confirmation of the elevation at which the Garage slab should be poured and whether any drainage modifications were required.

171.   Through a series of back-and-forth communications, PRH provided vague or incomplete responses to Plaza's repeated requests for clarification regarding the effects of the settlement and the potential for improper pool deck sloping that would result from PRH's directions on how to proceed.

172.   On August 22, 2016, Plaza informed PRH that the lack of resolution on the pool depth and pool deck slopes was bringing the construction of the pool deck to a halt.

173.   As a result of PRH's previous design changes, PRH extended the interstitial slab from the Garage over the adjoining Bayhomes structure. This change in the interstitial slab between level 4 of the Garage and the pool deck prevented the pool from being built to the desired depth.

174.    Moreover, PRH failed to redesign the main pool drain when the interstitial slab was extended. The inaccuracy of the main pool drain design compounded the other design issues that arose as a result of the Tower settlement.

175.    The pool deck depth and settlement issues were exacerbated by PRH's ad hoc changes, including changes to the Bayhomes, changes to the interstitial space, and failure to redesign peripheral components affected by the Bayhomes redesign. These seemingly disparate issues coalesced in the pool deck depth issue.

176.    In attempting to resolve these issues, PRH continued to provide incomplete or erroneous information. For example, PRH provided sketch SSK 23 which was missing PT cable information, and sketches ASK 65.1 and 65.2, and SKP 61 and 62, which affected the south area Pool Deck Level 5 elevations, reflected drain elevation high points and low points that were in conflict in many areas and the drawings did not account for the settlement of the Tower and the previously issued response to RFI #569. These defective sketches demonstrate that PRH was not revising its design to address the ongoing conflicts and issues on the Project; rather it continued to issue defective design drawings to Plaza.

177.    Sometime later, PRH instructed Plaza to lower the elevation of the pool deck by four inches to align with level 5 of the Tower. This direction affected work in place on the south and middle sections of the Garage.

178.    In response, Plaza explained that the decision to lower the elevation of the pool deck by 4-inches will result in a 4-inch step at Tower II (Gran Paraiso) on the other end of the pool deck.

179.    Over a month later, Plaza received additional drawings for this work; however, the drawings were completely erroneous and omitted all deck drain elevations, only showing the

Wood Deck area drain elevations.  In addition, the "LEGEND" on the drawings indicated that Plaza was to match the floor elevation of Tower II (Gran Paraiso) only in the "highlighted areas," which were incorrectly shaded and did not account for the slope to meet the pool deck elevations.

180.    In other words, if Plaza were to build the work based on the markups in the drawings issued by the Architect, Plaza would have to construct a three to four-inch curb on the pool deck, which is not allowed on walkways due to it being a tripping hazard.

181.    Several more iterations of drawings were provided by PRH and its Architect before the issue was properly resolved.

182.    Remarkably, throughout this process, PRH unilaterally proclaimed that the Contract time was to remain unchanged, despite the significant time devoted to resolving these defective design issues.

### ii.    Revised Planter Drains at Pool Deck (CCD #83)

183.    The settlement issue discussed above had broader impacts on the Project work. In addition to affecting the pool depth and the pool deck elevation, it impacted the concrete planters that are located throughout the pool deck area.

184.    After the issuance of SSK 23 on August 24, 2016, many questions arose regarding the pool deck elevations and post-tensioning design. Accordingly, a pool deck subcontractor coordination meeting was held by Plaza.

185.    Pursuant to this meeting, Plaza requested a set of drawings showing dimensions for the pool deck cast in place concrete planters from PRH's pool deck designer. On August 30th, 2016, a drawing for this work was issued.

186.    Around that time, the Architect and PRH's pool deck designer discussed the effect of the settlement issue on the depth of the pool deck planters. The Architect acknowledged that as

a result of adjustments to the pool deck level to compensate for the settlement of the Tower, some planters will be 3'3" at best, rather than specified 3'6".

187.    PRH's pool deck designer acknowledged that some of the concrete planters had already been poured, resulting in the need for concrete coring and chipping in order to alter these completed planters to meet the new (very belated) redesign.

188.    Plaza subsequently issued a series of submittals requesting additional information and attempting to address the Bayhomes / interstitial piping / planter drain conflict issue.

189.    Before even approving the submittals, PRH directed Plaza to begin saw cutting and chipping the poured concrete planters.

190.    A revised planter drain elevation and CCD were issued by PRH on November 14, 2016. Plaza proceeded to re-route the planter drains based on the revised design. Remarkably, this CCD also provided that the Contract time is to remain unchanged, despite significant time and remediation of completed work devoted to resolving this issue.

191.    By November 15, 2016, Plaza's subcontractor completed chipping out the previously poured concrete deck planter boxes. Plaza was finally able to begin constructing the work in accordance with the final design from PRH, on November 21, 2016.

192.    On January 17, 2017, just days before the current Substantial Completion date, Plaza poured the modified level 5 pool deck slab, completing this portion of the pool deck saga, though follow-on work remained.

**iii.    Revised Pool Coordination (SSK 23)**

193.    On August 24, 2016, PRH issued sketch SSK 23, which provided pool coordination drawings. Plaza's subcontractor requested the RAM model to confirm information regarding the

slab geometry depicted on SSK 23 in order to finalize and submit shop drawings and release the needed materials for fabrication.

194.    The RAM model, which the subcontractor needed to proceed with this work, was not received from PRH's designer until over a month later, on September 30th, and the shop drawing resubmittal/approval process for the pool deck water feature was finally completed on October 20, 2016, which permitted the rebar material to be released for fabrication.

195.    This material was received on October 27, 2016, allowing for completion of concrete reinforcing and pouring at level 4.5 of the Garage / pool deck structure on November 1, 2016.

196.    PRH's redesign for the remainder of the pool deck area continued through the month of December and required several iterations before a final design was approved.

197.    Notably, the post-tensioning information missing from SSK 23 was not resolved until December 12, 2016, over three months after the issuance of SSK 23. Once resolved, Plaza was able to pour level 5 pool deck slab on January 17, 2017; again, mere days before the current Substantial Completion deadline, with significant follow-on work left to be performed.

### E.  Additional Delays to Bayhomes

198.    The Bayhomes impacts discussed above related to the initial challenges Plaza faced with constructing the Bayhomes. However, PRH's continued, and belated, changes to this scope were ongoing impacts to the Project.

199.    The changes implemented by Revisions J, K, L and sketch ASK 50 not only affected the structure of the Bayhomes, they affected the geometry of the slab pours as well.

200.    Inside the Bayhomes, bathroom locations were changed, air conditioning closet locations were changed, spas were added and later deleted, kitchen layouts were revised, and mechanical components were added and/or relocated.

201.    These voluminous changes forced Plaza to come back after the deck concrete pouring and re-shoring removal were completed, and perform a significant amount of re-work.

202.    On April 13, 2016, PRH returned Submittal 1500-044 for the Bayhomes / Garage Duct Sleeving Drawings Level 1 & 2, which showed modifications from the previously issued Revision J drawings. Plaza responded with the following email:

> *"These changes were not issued in time. **As you know we poured the unit 2 bayhome this morning at 7am. This will now require additional come back work to cut in the required openings, if possible at all due to cable locations**. It's evident to me that you have not been able to push the design hard enough to keep up with the construction being performed in the field. Also, to remind you that you still have not issued MEP drawings for bayhomes."*

203.    PRH's response was: "***Keep pouring.***"

204.    PRH's response to Plaza's attempts to raise awareness about the impacts it was causing to the Project were blatantly disregarded. Throughout the course of construction, PRH has shown a complete disregard for the Project schedule and has insisted that Plaza shoulder all the financial burden.

205.    In summary, Plaza was directed by PRH to pour the Bayhomes' concrete structure based on Revision J (i.e. without regard to mechanical piping locations, which would have to be retrofitted later).

206.    Accordingly, after completion of the Bayhomes' concrete structure, Plaza had to undertake a labor-intensive retrofit process in order to incorporate the new design, which could have been completely avoided if PRH had timely issued the proper design.

207.    Once the above remediation was completed, the overhead mechanical rough-in could commence, which is the first activity that could be performed in the interior of the units in order to proceed with the subsequent work.

208.    Additional impacts to the Project were caused by the actual time needed to review and approve the mechanical / electrical / plumbing ("MEP") coordination drawings, as well as the projections for the amount of time the anticipated x-ray locations work and core drilling work would require.

209.    Regarding the MEP coordination drawing approval process, while Level 1 took only one week, the PRH design team's turnaround time for Levels 2 and 3 of the Bayhomes was significantly longer – between 6 and 7 weeks. All this wasted time and the associated impacts could have been avoided if the Revision L drawings had been timely issued.

210.    The mechanical drawings provided by PRH were not adequately coordinated between all of PRH's design consultants. In addition, PRH failed to select / specify some of the bathroom fixtures / appliances before the design drawings were issued. Due to PRH's very late selection / specification of these fixtures, and the conflicts resulting from the same, Requests for Information ("RFI's") had to be issued and resolved, which further impacted the completion of the Bayhomes. Some of the most significant RFI's include RFI nos. 745, 747, 749, 754, 756, 768.

    a.    RFI #745 affected Bayhome 1, Level 1, showing a conflict between MEP drawings and partitions. As a result, additional core drilling had to be done and walls relocated.

    b.    RFI #747 affected Bayhome 1 and requested missing information in regard to tub type and model, type of tiles, plumbing fixture types and elevations.

42

     c.   RFI #749 affected Bayhome 1 and requested missing information for the location of the bath diverters.

     d.   RFI #754 addressed a conflict between the post-tensioning cables and the designed location of a duct through the slab.

     e.   RFI #756 affected Bayhome 3 and addressed conflicts between the MEP drawings and the partitions. It also requested missing information in regard to tub type and model, type of tiles, plumbing fixture types and elevations.

     f.   RFI #768 affected Bayhome 5 and addressed conflicts between the MEP drawings and the partitions. It also requested missing information in regard to tub type and model, type of tiles, plumbing fixture types and elevations.

211.    Unfortunately, the impacts Plaza endured relating to PRH's Bayhomes' redesigns and related directives by PRH had a dramatic effect on the Project schedule and significantly delayed the projected Substantial Completion date.

### F.  Impacts After the Substantial Completion Deadline

212.    In addition to the numerous PRH-caused delays discussed above, the Project has experienced numerous revisions and changes, all of which have occurred after the current Substantial Completion date. PRH's issuance of changes to several scopes of work reflects the fact that PRH is still finalizing its design nearly six (6) months after the date by which it insists Plaza should have been substantially done with the work.

213.    Examples of some of the post-completion period impacts for which PRH is responsible are discussed below.

### i.   PRH's Direction to Stop Work at Bayhomes 2 and 3

214.   On March 24, 2017, two months after the current Substantial Completion deadline, PRH directed, in writing, that Plaza put Bayhomes 2 and 3 on hold until further notice.

215.   On June 16, 2017, almost three months after directing Plaza to stop work on Bayhomes 2 and 3, PRH took the first step toward ending the directed suspension and issued CCD 109, which provided details regarding PRH's desired changes to Bayhomes 2 and 3. The changes included extensive modifications to the interior layout, requiring the addition and/or relocation of completed walls, mechanical work, and electrical work.

216.   Based on the date of the CCD, and the retrofit and additional work included in the CCD, as of the end of June 2017, this issue continued to be the longest path of the Project schedule.

217.   PRH's direction to stop work on the Bayhomes further delayed the Substantial Completion date of the Project. The Bayhomes work was already driving the critical path of the Project schedule, and PRH further extended the duration of this work by refusing to let Plaza proceed.

### ii.   Other Bayhomes Impacts

218.   The following are additional examples of PRH-directed changes to the Bayhomes in this period:

   a.   *RFI 836 & 838 (NOT #228)* – On March 9, 2017, in response to RFI 836, the Architect added thermal protection (rigid insulation) below the roof/terrace levels of the Bayhomes. On March 14, 2017, in response to RFI 838, the Architect revised a portion of the above and added insulation to a coat of "Supertherm" insulation paint.

b. *CCD 102* – On May 25, 2017, PRH issued CCD 102, making significant revisions to the exterior of Bayhomes 2 and 3. This work includes the demolition of walls that were recently completed per PRH's previously-issued design and the completion of the building façade.

c. *CCD 103* – On May 25, 2017, PRH issued CCD 103, changing the location of all the condensing units (CU) for Bayhomes 1 through 8 and adding additional fans in the Garage. Plaza had already warned PRH back in January 2017 (RFI 427), and again in several subsequent emails, that there could be an issue with the location of the condensing units. At that time, PRH ignored the warning and directed Plaza to install the CUs as previously designed. CCD 103 will require Plaza to layout and run all new lines from each of the Bayhomes units to the new CU locations, pour the concrete pads and install the CUs in the new locations.

d. *Stop Work at Bayhome #1* – On June 16, 2017, PRH directed Plaza to stop all work at Bayhome 1. To date, PRH has not provided new direction to Plaza, or lifted the directed suspension so that Plaza could proceed with this work.

### iii.   Additional Impacts to Upper Penthouse (UPH) Units

219.   In addition to the PRH-directed changes discussed above, PRH impacted the UPH Units in other ways.

220.   The UPH Units were impacted by delays in the delivery of PRH-furnished plumbing fixtures and PRH's belated retraction of the previously-approved proposal for additional tiles in the four UPH Units, among others.

45

221.    Despite the fact that these PRH-caused impacts have occurred after the current Substantial Completion date, PRH still refuses to grant Plaza any relief in the form of a time extension.

a.    UPH Plumbing Fixtures

222.    On or about March 2017, PRH decided to change the brand of some of the plumbing fixtures in UPH Units 5301 and 5303.

223.    Plaza's subcontractor provided a price for the change, which PRH rejected, and PRH decided to procure the fixtures itself.

224.    On April 13, 2017, Plaza warned PRH that Plaza needed the plumbing fixtures to complete the plumbing rough-in of the units at level 53; otherwise, the work at these units was going to be at a standstill, potentially resulting in additional impacts to the Project schedule.

225.    Specifically, the plumbing fixtures included valves that are installed within the walls (behind the drywall). Therefore, the plumbing rough-in could not be completed without these valves, and as a consequence, the plumbing inspection could not be requested.

226.    The delay in the arrival of PRH-furnished plumbing fixtures also held up all the successor activities, including installation of the drywall, installation of the door frames, and installation of the tiles on the UPH Units.

227.    The PRH-supplied plumbing fixtures were finally received on site on June 26, 2017.

b.    UPH Units Additional Tiles

228.    As requested by PRH, on March 24, 2017, Plaza provided a proposal for the installation of additional tiles in the UPH Units.

229.    Originally, Plaza was not responsible for installing flooring in the UPH Units. The units were simply required to be "designer ready" when turned over to PRH. The additional work consists of tiling the entirety of floors as well as portions of the walls in the UPH Units, which consists of nearly 4,000 square feet of additional tile work.

230.    On May 1, 2017, PRH accepted Plaza's proposal for this work.

231.    PRH then transmitted CCD 99 on May 10, 2017, directing Plaza to proceed with the tile installation, with the tiles to be supplied by PRH. The CCD also added other, related work, including soundproofing barrier, shower curbs, and a raised concrete platform in the master bathrooms.

232.    However, on May 31, 2017, more than two months after receiving Plaza's proposal and one month after approving it, PRH arbitrarily retracted its approval and directed Plaza to procure another subcontractor.

233.    The next day, on June 1, 2017, Plaza began the process of identifying and engaging a replacement tile installation subcontractor. On June 29, 2017, PRH executed the new proposal for the additional tile work with the replacement subcontractor.

234.    Notably, at the time Plaza submitted, and PRH approved, the original proposal for this additional work, the work was not critical and was not impacting the Project schedule.

235.    However, PRH's arbitrary and belated rescission of the original, approved proposal, and the procurement of a replacement subcontractor, impacted the Project schedule.

c.    NOT #300 – UPH Custom PRH-supplied Light Fixtures

236.    In addition to the above delays to the UPH Units, PRH-supplied light fixtures impacted the completion of UPH Unit 5301.

237.    On June 9, 2017, PRH-supplied light fixtures for the UPH Units were received on site. However, the fixtures were incomplete and could not be installed because the housing was missing and the ballast supplied was incorrect.

238.    The correct materials were finally supplied on June 19, 2017.

            d.    UPH Unit 5301 – Spa Missing Sub-Drain

239.    In April 2017, Plaza notified PRH that PRH's design was defective and that the spa in UPH 5301 was missing a sub-drain.

240.    On May 3, 2017, PRH provided a sketch indicating that a sub-drain was necessary. Since the spa had already been installed, Plaza and PRH coordinated with PRH's pool supplier in order to create an opening at the spa bottom that would allow installation of the drain without affecting the manufacturer's warranty.

241.    On June 7, 2017, the extra work to remedy this design defect was completed. However, during this time, a further issue related to the waterproofing detail was discovered, and Plaza had to wait for this additional detail to be provided by PRH's designer to complete the work. The waterproofing detail was delivered by PRH on June 21, 2017.

242.    Continuous coordination with PRH's manufacturer and PRH's waterproofing subconsultant resulted in the need to create a larger (24" by 24") opening than the one opened on June 7. It was not until July 1 that the pool manufacturer could come back to the jobsite to perform this work.

            iv.    **Other Post-Contract Completion Changes**

243.    The following are additional examples of PRH directives that forced Plaza to perform extra work in the post-Contract completion period, thereby preventing Plaza from

achieving Substantial Completion by the current deadline as well as hindering Plaza's ability to mitigate PRH-caused delays by achieving an earlier Partial-TCO:

a. *CCD 088* – On February 17, 2017, PRH issued CCD 088, adding a concrete retaining wall at the Lobby Drop-off area

b. *CCD 090* – On February 27, 2017, PRH issued CCD 090, revising the planters at the wood deck area on the pool deck.

c. *CCD 093 (RFI 758)* – On December 14, 2016, Plaza submitted RFI 758, requesting clarification regarding the drawings for the reflection pools that were previously added (through RFI 606) by PRH at the level 5 pool deck. On March 24, 2017, PRH responded to RFI 758 by issuing sketch drawings LSK #28 and CCD #93, which also modified the landscape and hardscape at ground level.

d. *CCD 094* – On March 24, 2017, PRH issued CCD 094, providing structural sketch SSK #26 to build a new concrete stair at the ground exit on the northeast side of the tower, which was required due to the difference in level between the tower exit and the final grade outside of the building. However, the information provided by PRH was incomplete and inadequate for Plaza to price or to proceed. The CCD was missing civil and drainage information (See CCD 096 below).

e. *CCD 095* – On March 30, 2017, PRH issued CCD 095, adding fire alarm devices in the pool deck area. This modification required new fire alarm conduits and poles at the newly-selected locations. As a result of this change, finished areas on the pool deck must be saw cut, chipped and cored, waterproofing breached, tile removed, and conduit installed, followed by significant restoration work.

f.  *CCD 096* – On March 31, 2017, PRH issued CCD 096. The new CCD provided some of the information missing from CCD 94, and included additional work in the form of two additional lift stations. Critical information was also missing from CCD 096 including, but not limited to, PRH's failure to incorporate the Tower settlement into the civil and drainage piping drawings, and design conflicts between civil, architectural, structural, and landscape drawings. On April 14, 2017, PRH issued CCD 096R with additional drawings (C-4A and C-4B), but the structural, architectural and landscape disciplines' information was still missing. On April 24, 2017, PRH issued yet another set of drawings with additional information related to CCD 096R.

g.  *NOT 234 / NOT 235* – On March 14, 2017, Plaza notified PRH that seven or eight of the eleven boxes of pool deck tiles supplied by PRH contained tiles that were a darker color than Plaza believed PRH desired / intended. Plaza requested confirmation to proceed with the installation of these tiles, and PRH directed Plaza not to stop installation. PRH directed Plaza to sort the material and selectively install the tiles (i.e. segregating and excluding use of the darker tiles). Plaza notified PRH that this direction will increase the subcontractor's cost and time for performance. On April 5, 2017, Plaza ran out of PRH-supplied pool deck tiles that were the lighter color preferred by PRH. PRH supplied some, but not all, of the additional tiles, but by May 10, 2017, Plaza had again run out of Owner-supplied tiles that met PRH's color preference. During the month of June, PRH furnished the remaining tiles needed to complete this work.

50

h. *CCD 106* – On June 14, 2017, PRH issued CCD 106, directing Plaza to apply waterproofing at the interstitial slab level 4.5 (under the level 5 pool deck). On June 10, 2017, Plaza sent a letter to PRH raising several concerns about the additional work. Among the major concerns were accessibility and that the area is about 34" height and considered a confined space.

i. *CCD 118* – Additional Tile Upgrade of Units 320, 4706, 5101, and 5204 – This CCD was issued on June 29, 2017, and requires the removal of toilets, vanities, and master bathroom divider glass to allow for the tile installation at the referenced units.

j. *CCD 119* – Relocation of Bayhomes Corridor AC Units – On June 29, 2017, the three A/C Condensing Units located at the corridor west of the Bayhomes, were directed to be relocated from their previously-designed locations. These units are in addition to the eight CUs relocated under CCD 103.

244.    Despite PRH's continued revisions, additions and modifications to the Project, which clearly impact the schedule, PRH has refused to grant Plaza even a single day of time extension.

## IV.    TIME IMPACT ANALYSES

245.    PRH's refusal to acknowledge its responsibility for Project delays has been as dramatic as the changes it has directed and the problems it has caused. Despite the major impacts PRH has caused – over ten (10) months so far, PRH has only granted a time extension for five (5) days, which was for adverse weather.

246.    Plaza has continually kept PRH apprised of the delays to the Project, and has demonstrated its entitlement to time extensions. Plaza previously submitted Time Impact Analyses

("TIA's") 1, 2, 3, 4, 5, 6 and 7 requesting time extensions. Each of these TIA's discusses the impacts for which PRH is responsible and demonstrates Plaza's entitlement to the requested extension of time and the time-related costs of the delays. Through these TIA's, collectively, Plaza has requested time extensions totaling 310 calendar days, which would extend the Project's Substantial Completion date to November 30, 2017.  The following points briefly summarize each TIA.

247.    TIA-1, submitted on February 8, 2016, demonstrated that the Project's Substantial Completion date was delayed 88 calendar days, to April 17, 2017. Five of these days were the result of weather delays, and the Contract Substantial Completion date was adjusted accordingly – from January 19 to January 24, 2107. This TIA established that the rest of the delay was the result of several events for which PRH is responsible, including: PRH's failure to close 31st Street until six (6) months after the date required by the Contract; PRH's Garage / Tower II foundation redesign; and PRH's Garage/Bayhomes foundation redesign.

248.    TIA-2, submitted on July 8, 2016, confirmed that Project delays resulted from several events for which PRH is responsible, including PRH's belated and pervasive changes to the Tower units, which affected nearly every unit on the vast majority of floors, including many floors where the affected work had already been completed. The litany of unit changes included, among others: combining units and altering interior layout (which was expressly prohibited by the Contract), changing door types and sizes, adding significant areas to be finished with floor tiles, changing baseboards and trim work, modifying hardware, altering vanity locations and bathroom sinks, modifying bathroom glass, moving bathroom counter tops, and changing shower curbs. In total, these belatedly-directed changes affected units on forty-six floors. The scope of this TIA also

included initial impacts relating to substantial design changes that PRH directed, including through Revisions J, K and L, to the Garage and Bayhomes.

249.    TIA-3, submitted on October 5, 2016, addressed certain delays to the Tower caused by the impacts to the 5th Floor Amenities Level.  This TIA confirmed that Project delays resulted from several PRH-caused impacts in this area, including delays to the windows needed to enclose the space, delays and significant budget issues related to pricing and installation of area finishes, delays to PRH-supplied tile, in addition to other PRH-directed changes to this area that delayed completion of this work.

250.    TIA-4, submitted on January 8, 2017, demonstrated an extended Project Substantial Completion date of August 7, 2017, relating to delays associated with the pool deck and Tower, which were caused by issues related to the settlement of the Tower and the resulting adjustment to the design of the pool deck, pool deck planters and Bayhome ceilings. The failure of PRH and PRH's Architect to properly address the settlement issue, including the issuance of incomplete and erroneous drawings and delays in providing clear direction to Plaza on how to proceed, resulted in significant schedule impacts. Delays to the Project's Substantial Completion date were also incurred due to additional coordination and remedial work that resulted from impacts to the Bayhomes due to the late issuance of design Revision L.

251.    TIA-5, submitted on February 28, 2017, evaluated the continuing impacts to the Project schedule relating to PRH's substantial design changes for the Bayhomes, specifically focusing on the actual time that was spent to review and approve the MEP coordination drawings, along with a projection of the estimated amount of time that would be needed to retrofit the Bayhomes' MEP work (x-ray locations work and coring of sleeves to accommodate PRH's changes to these systems' locations).

252.    TIA-6, also submitted on February 28, 2017, evaluated the remaining impacts to the Project schedule relating to PRH's substantial design changes for the Bayhomes. Specifically, TIA-6 analyzes the actual durations experienced to retrofit the Bayhomes following PRH's extensive, belated and piecemeal redesigns of the Bayhomes.[1]

253.    TIA-7, submitted on July 25, 2017, addressed the significant impacts to the UPH Units, including additional tile installation and belated delivery of bathroom and lighting fixtures, in addition to PRH's direction to completely stop work on certain Bayhomes for months. TIA-7 also highlighted several examples of the other changes directed by PRH in the post-Contract completion period, including another thirty-three (33) CCDs and numerous other PRH modifications made via RFI responses or sketches – all of which occurred after the current Project Substantial Completion date.

254.    Pursuant to the Contract, for PRH-directed changes to date and other impacts for which PRH is responsible, Plaza is entitled to an extension of the Substantial Completion deadline through and including November 30, 2017. Additionally, under the Contract's terms and Florida law, Plaza is entitled to more than $4 million of additional compensation for its extended general conditions and general requirements costs for these delays.

---

[1] On February 2, 2017, after approximately 250 calendar days of PRH-caused impacts were already incurred, a flooding event occurred, which affected components of the elevators to be installed on the Project. Plaza has repeatedly advised PRH that the replacement of elevator doors will not affect obtaining either Partial-TCO or Substantial Completion because the existing doors (including those exposed to water) can be installed and the elevators will function as intended. Any remaining elevator doors that have not been replaced before Partial-TCO or Substantial Completion will be replaced as warranty items.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

255.   Plaza restates and realleges paragraphs 1 through 254, above.

256.   PRH has failed to perform its obligations under the Contract and has materially breached the Contract by, among other things and without limitation:

    a.   failing to provide access to the work;

    b.   failing to provide an accurate, constructible design;

    c.   failing to compensate Plaza for the extra work, additional work and changed work that PRH directed Plaza to perform;

    d.   failing to supply PRH-supplied materials on a timely basis;

    e.   actively interfering in Plaza's performance of its work;

    f.   failing to timely pay Plaza all amounts properly due and owing to Plaza under the Contract;

    g.   failing to grant extensions of time to which Plaza is entitled; and

    h.   failing to compensate Plaza for the impacts, delays, disruptions and losses of efficiency caused by PRH and/or for which PRH is responsible.

257.   As a direct, foreseeable and proximate result of PRH's material breaches of the Contract, Plaza suffered damages including, without limitation, increased costs for labor, material, equipment, services, subcontractors, general conditions, general requirements, expanded management, disruption, losses of efficiency and acceleration, .

258.   WHEREFORE, Plaintiff, Plaza Construction Group Florida, LLC, respectfully requests that judgment be entered in its favor and against, Defendant, PRH NE 31st Street, LLC, for damages along with an award of costs, expenses and attorneys' fees pursuant to Article 21.4 of

the Contract, pre-judgment interest, post-judgment interest, and any other relief that this Court deems proper or just.

## SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

259. Plaza restates and realleges paragraphs 1 through 254, above.

260. Under Florida law, there is an implied duty of good faith and fair dealing such that PRH shall not do anything to unfairly interfere with the rights of Plaza to receive the benefits of this Contract.

261. PRH has breached the implied covenant of good faith and fair dealing in the Contract and PRH has unfairly interfered with Plaza's right to receive the benefits of the Contract by, among others and without limitation:

a. failing to timely and in good faith evaluate Plaza's requests for Change Orders, including under Article 4.8 of the Contract;

b. failing to timely and in good faith negotiate, administer and issue Change Orders, including under Article 4.8 of the Contract;

c. failing to timely and in good faith evaluate Plaza's claims for additional compensation and/or extensions of time, including under Article 4.7 of the Contract;

d. failing to timely and in good faith negotiate, administer and approve Plaza's claims for additional compensation and/or extensions of time, including under Article 4.7 of the Contract; and

e. failing to administer the Contract and the Project in good faith, in accordance with the Contract's terms.

56

262.    As a direct, foreseeable and proximate result of PRH's breaches of the implied covenant of good faith and fair dealing, Plaza suffered damages.

263.    WHEREFORE, Plaintiff, Plaza Construction Group Florida, LLC, respectfully requests that judgment be entered in its favor and against, Defendant, PRH NE 31st Street, LLC, for damages along with an award of costs, expenses and attorneys' fees pursuant to Article 21.4 of the Contract, pre-judgment interest, post-judgment interest, and any other relief that this Court deems proper or just.

Respectfully submitted on the 24th day of August, 2017.

/s/ Sean M. Dillon
SEAN M. DILLON
Florida Bar No. 75388
sdillon@moopd.com
LIANA S. MADISON
Florida Bar No. 117039
lmadison@moopd.com
MOYE, O'BRIEN, PICKERT & DILLON, LLP
800 South Orlando Avenue
Maitland, Florida 32751
(407) 622-5250 Telephone
(407) 622-5440 Facsimile
Attorneys for Plaintiff

# "EXHIBIT A"

# CONSTRUCTION AGREEMENT

**Project:**          **Paraiso Bay, a condominium**

**Owner:**          **PRH NE 31ST Street, LLC, a Florida limited liability company**

**Contractor:**          **Plaza Construction Group Florida, LLC, a Delaware limited liability company**

#3743565 v9

## TABLE OF CONTENTS TO
## CONSTRUCTION AGREEMENT

1.   RECITALS, DEFINITIONS, TERMINOLOGY ................................................1

2.   WORK ................................................................................................9

3.   TIME ................................................................................................10

4.   GUARANTEED MAXIMUM PRICE ................................................14

5.   PAYMENT ................................................................................28

6.   OWNER'S DELIVERIES; REPRESENTATIVES................................36

7.   CONTRACTOR'S WARRANTIES AND REPRESENTATIONS...............36

8.   CONTRACTOR'S COVENANTS ................................................38

9.   WARRANTY................................................................................51

10.  FACILITIES ................................................................................53

11.  SUBCONTRACTORS................................................................54

12.  INDEMNIFICATION ................................................................57

13.  INSURANCE................................................................................57

14.  CESSATION ................................................................................68

15.  SUSPENSION ................................................................................68

16.  CONTRACTOR DEFAULT ................................................................69

17.  OWNER DEFAULT................................................................69

18.  TERMINATION FOR CONVENIENCE................................................70

19.  SUBCONTRACTS AND PERMITS UPON TERMINATION ...................70

20.  FINANCING ................................................................................70

21.  MISCELLANEOUS ................................................................72

<u>EXHIBITS:</u>

EXHIBIT "A"      Legal Description of the Site
EXHIBIT "B"      Allowances
EXHIBIT "C"      Forms of Payment Bond and Performance Bond
EXHIBIT "D"      Construction Schedule
EXHIBIT "E"      List of Contract Documents
EXHIBIT "F"      Contractor's and Owner's Representatives
EXHIBIT "G"      Contractor's Qualifications and Assumptions
EXHIBIT "H"      Final Punch Procedures
EXHIBIT "I"      Breakdown of Contractor's General Conditions Costs
EXHIBIT "J"      Breakdown of the GMP
EXHIBIT "K"      Moisture Control Program/Hurricane Preparedness Program
EXHIBIT "L"      Forms of Contractor's Partial Waiver and Release of Lien and
                 Contractor's Final Waiver and Release of Lien and Claims
EXHIBIT "M"      Forms of Subcontractor's Partial Waiver and Release of Lien and Claims
                 and Subcontractor's Final Waiver and Release of Lien and Claims

#3743565 v9

EXHIBIT "N"     Exceptions to Retainage
EXHIBIT "O"     Contractor's Project Staffing Plan
EXHIBIT "P"     Form Change Order
EXHIBIT "Q"     Form Change Directive

#3743565 v9

## CONSTRUCTION AGREEMENT

**THIS CONSTRUCTION AGREEMENT** (this "Agreement") is entered into this _____ day of November, 2014 (the "Effective Date"), by and between **PRH NE 31ST STREET, LLC,** a Florida limited liability company, having an address of 315 S. Biscayne Blvd., Miami, Florida 33130 ("Owner") and **PLAZA CONSTRUCTION GROUP FLORIDA, LLC**, a Delaware limited liability company, having an address of 120 NE 27th Street, Suite 600, Miami, Florida 33137 ("Contractor"). Owner and Contractor are sometimes hereinafter collectively referred to as the "Parties" and each, individually, as a "Party."

RECITALS

A.    Owner owns that certain real property located at 650 NE 31st Street, Miami, Florida 33137, and legally described on **Exhibit "A"** attached hereto and made a part hereof.

B.    Owner desires to contract with Contractor to construct upon the Site (as defined herein), and Contractor desires to construct upon the Site, the following described improvements known as Paraiso Bay, a luxury condominium consisting of three hundred sixty-eight (368) residential condominium units, a parking garage containing six hundred (600) parking spaces, an entrance lobby, a drop-off area, an exterior pool deck consisting of a 90' diameter pool, a spa, a children's pool, water features, a barbeque area and an amenities level consisting of a gym, changing rooms, party room, business center and other related amenities.

C.    NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

TERMS

## 1.    RECITALS, DEFINITIONS, TERMINOLOGY

1.1    Recitals.  The Parties agree that the foregoing Recitals are true and correct and incorporated herein by this reference.

1.2    Definitions.   Wherever used in the Contract Documents (as defined herein) and printed with initial or all capital letters, the terms listed below will have the meanings indicated which are applicable to both the singular and plural thereof:

1.2.1    *Allowances* – The allowable Cost of the Work for certain portions/items of the Work, which are identified and described on **Exhibit "B"** attached hereto and made a part hereof.

1.2.2    *Application for Payment* or *Requisition* – The form acceptable to Owner and Lender which is to be used by Contractor during the course of the Work in requesting monthly progress payments and Final Payment (as defined herein) and which shall be accompanied by such supporting documentation required by the Contract Documents.

1.2.3    *Architect* – The Person described in this Agreement as "Architect" (*i.e.*):

#3743565 v9

1