IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:17-cv-23284-DPG

PLAZA CONSTRUCTION GROUP
FLORIDA, LLC, a Delaware limited liability
company,

       Plaintiff,

vs.

PRH NE 31ST STREET, LLC, a Florida
limited liability company,

       Defendant.

_____/

**DEFENDANT'S AMENDED ANSWER TO THE COMPLAINT**
**AND COUNTERCLAIMS AGAINST PLAINTIFF**

Defendant PRH NE 31st Street, LLC, a Florida limited liability company ("Owner" or "Defendant"), hereby submits its amended answer to the Complaint filed by Plaintiff Plaza Construction Group Florida, LLC, a Delaware limited liability company ("Contractor" or "Plaintiff") and its counterclaims against Contractor and states as follows:

**GENERAL DENIAL**

Except as otherwise expressly stated herein, Owner denies each and every allegation in the Complaint, including, without limitation, any allegations contained in the Complaint's headings, subheadings, or footnotes, and denies any liability to Contractor. Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, averments in the Complaint to which no responsive pleading is required shall be deemed as denied. Owner expressly reserves the right to seek to amend and/or supplement its Answer as may be necessary.

## RESPONSES TO SPECIFIC ALLEGATIONS

Incorporating the foregoing, Owner states as follows to the specific allegations in the Complaint.  The following numbered paragraphs correspond to the numbered paragraphs of the Complaint.

1.      Owner admits that Contractor has filed this action against Owner seeking damages.  Owner denies that Contractor is entitled to any relief against Owner and otherwise denies the allegations contained in paragraph 1 of the Complaint.

2.      Owner admits that on or about November 2014, Owner and Contractor entered into a written Construction Agreement, as amended (the "Agreement"; hereinafter, the term "Contract" shall mean and include the Agreement along with the Contract Documents (as defined in the Agreement)) pursuant to which Contractor agreed to construct for Owner, on the terms and conditions set forth in the Contract, the luxury condominium known as Paraiso Bay (the "Project") located in Miami-Dade County, Florida.  Owner admits that the Contract speaks for itself.  Owner further admits that excerpts of the Agreement are attached to the Complaint as Exhibit A. To the extent that the allegations in paragraph 2 of the Complaint are inconsistent with the Contract, they are denied.   Owner otherwise denies the allegations contained in paragraph 2 of the Complaint.

3.      Owner denies the allegations contained in paragraph 3 of the Complaint.

4.      Owner denies the allegations contained in paragraph 4 of the Complaint.

5.      Owner denies the allegations contained in paragraph 5 of the Complaint.

6.      Owner admits that Owner and Contractor agreed, by Change Order, to extend the Contract's date for "Substantial Completion" (as defined in the Agreement) of the Project from January 19, 2017 to January 24, 2017.   Owner admits that Contractor failed to achieve

2

Substantial Completion by January 24, 2017.  Owner otherwise denies the allegations contained in paragraph 6 of the Complaint.

7.      Owner denies the allegations contained in paragraph 7 of the Complaint.

8.      Owner admits that as of the date of this filing Contractor has yet to achieve Substantial Completion of the "Work" (as defined in the Agreement). Owner otherwise denies the allegations contained in paragraph 8 of the Complaint.

9.      Owner admits that Contractor is a licensed general contractor that is authorized to do business in the State of Florida and that it has a place of business in Miami-Dade County, Florida.  Owner otherwise denies the allegations contained in paragraph 9 of the Complaint.

10.     Owner admits the allegations contained in paragraph 10 of the Complaint.

11.     Owner admits that venue is proper in Miami-Dade County, Florida, because (i) the Project is located there and (ii) the Agreement provides, at Section 21.7, that disputes between Owner and Contractor related to or in any way connected to the Contract "shall be resolved by litigation in a court of competent jurisdiction, the sole and exclusive jurisdiction and venue of which shall be the State and Federal Courts in and for Miami-Dade County, Florida." Owner otherwise denies the allegations contained in paragraph 11 of the Complaint.

12.     Owner denies the allegations contained in paragraph 12 of the Complaint.

13.     Owner admits that the parties executed the Agreement in November 2014 and that Contractor attached a total of four (4) pages from that Agreement, including the cover page and table of contents, as Exhibit A to the Complaint.   Owner otherwise denies the allegations contained in paragraph 13 of the Complaint.

14.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.   Owner otherwise denies the allegations contained in paragraph 14 of the Complaint.

15.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.  Owner denies the allegations contained in paragraph 15 of the Complaint.

16.     Owner admits the allegations contained in paragraph 16 of the Complaint.

17.     Owner denies the allegations contained in paragraph 17 of the Complaint.

18.     Owner denies the allegations contained in paragraph 18 of the Complaint.

19.     Owner denies the allegations contained in paragraph 19 of the Complaint.

20.     Owner admits that the Contract contemplates "Change Directives" (as defined in the Agreement) and "Change Orders" (as defined in the Agreement).   Owner otherwise denies the allegations contained in paragraph 20 of the Complaint.

21.     Owner admits that the Agreement defines a Change Directive, that the Agreement speaks for itself, and denies any allegations that are inconsistent with the Agreement or the other Contract Documents.   Owner otherwise denies the allegations contained in paragraph 21 of the Complaint.

22.     Owner admits that the Agreement defines a Change Order, that the Agreement speaks for itself, and denies any allegations that are inconsistent with the Agreement or the other Contract Documents.   Owner otherwise denies the allegations contained in paragraph 22 of the Complaint.

23.     Owner denies the allegations contained in paragraph 23 of the Complaint.

24.     Owner admits that it issued Change Directives as permitted by, and in accordance with, the Agreement, and that Owner and Contractor executed Change Orders as contemplated by, and in accordance with, the Agreement and the other Contract Documents.  Owner otherwise denies the allegations contained in paragraph 24 of the Complaint.

25.     Owner denies the allegations contained in paragraph 25 of the Complaint.

26.     Owner denies the allegations contained in paragraph 26 of the Complaint.

27.     Owner denies the allegations contained in paragraph 27 of the Complaint.

28.     Owner denies the allegations contained in paragraph 28 of the Complaint.

29.     Owner denies the allegations contained in paragraph 29 of the Complaint.

30.     Owner denies the allegations contained in paragraph 30 of the Complaint.

31.     Owner admits that Contractor failed to achieve Substantial Completion of the Work within the Contract Time as defined in the Agreement.   Owner otherwise denies the allegations contained in paragraph 31 of the Complaint.

32.     Owner denies the allegations contained in paragraph 32 of the Complaint.

33.     Owner denies the allegations contained in paragraph 33 of the Complaint.

34.     Owner admits that the Contract speaks for itself.  Owner denies any allegations that are inconsistent with the Contract.  Owner otherwise denies the allegations contained in paragraph 34 of the Complaint.

35.     Owner denies the allegations contained in paragraph 35 of the Complaint.

36.     Owner denies the allegations contained in paragraph 36 of the Complaint.

37.     Owner denies the allegations contained in paragraph 37 of the Complaint.

38.     Owner denies the allegations contained in paragraph 38 of the Complaint.

39.     Owner denies the allegations contained in paragraph 39 of the Complaint.

40.    Owner denies the allegations contained in paragraph 40 of the Complaint.

41.    Owner denies the allegations contained in paragraph 41 of the Complaint.

42.    Owner denies the allegations contained in paragraph 42 of the Complaint.

43.    Owner admits that Contractor's obligations are governed by the Contract.  Owner denies any allegations that are inconsistent with the Contract.  Owner otherwise denies the allegations contained in paragraph 43 of the Complaint.

44.    Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.  Owner denies the remaining allegations contained in paragraph 44 of the Complaint.

45.    Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.  Owner denies the remaining allegations contained in paragraph 45 of the Complaint.

46.    Owner denies the allegations contained in paragraph 46 of the Complaint.

47.    Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.  Owner denies the remaining allegations contained in paragraph 47 of the Complaint.

48.    Owner denies the allegations contained in paragraph 48 of the Complaint.

49.    Owner denies the allegations contained in paragraph 49 of the Complaint.

50.    Owner denies the allegations contained in Paragraph 50 of the Complaint.

51.    Owner denies the allegations contained in paragraph 51 of the Complaint.

52.    Owner denies the allegations contained in paragraph 52 of the Complaint.

53.    Owner denies the allegations contained in paragraph 53 of the Complaint

54.    Owner denies the allegations contained in paragraph 54 of the Complaint.

55.     Owner denies the allegations contained in paragraph 55 of the Complaint.

56.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.   Owner denies the remaining allegations contained in paragraph 56 of the Complaint.

57.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.   Owner denies the remaining allegations contained in paragraph 57 of the Complaint.

58.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.   Owner denies the remaining allegations contained in paragraph 58 of the Complaint.

59.     Owner denies the allegations contained in paragraph 59 of the Complaint

60.     Owner denies the allegations contained in paragraph 60 of the Complaint.

61.     Owner denies the allegations contained in paragraph 61 of the Complaint.

62.     Owner denies the allegations contained in paragraph 62 of the Complaint.

63.     Owner admits that Contractor failed to progress with Work in accordance with the Construction Schedule (as defined in the Agreement).   Owner further admits that Contractor failed to achieve Substantial Completion of the Work within the Contract Time. Owner otherwise denies the allegations contained in paragraph 63 of the Complaint.

64.     Owner denies the allegations contained in paragraph 64 of the Complaint.

65.     Owner denies the allegation contained in paragraph 65 of the Complaint.

66.     Owner denies the allegations contained in paragraph 66 of the Complaint.

67.     Owner denies the allegations contained in paragraph 67 of the Complaint.

68.     Owner admits that the Plans (as defined in the Agreement) speak for themselves. Owner otherwise denies the allegations contained in paragraph 68 of the Complaint.

69.     Owner denies the allegations contained in paragraph 69 of the Complaint.

70.     Owner denies the allegations contained in paragraph 70 of the Complaint.

71.     Owner denies the allegations contained in paragraph 71 of the Complaint.

72.     Owner denies the allegations contained in paragraph 72 of the Complaint.

73.     Owner denies the allegations contained in paragraph 73 of the Complaint.

74.     Owner denies the allegations contained in paragraph 74 of the Complaint.

75.     Owner admits that the changes in the Work alleged in the Complaint did not cause "Delays" (as defined in the Agreement) and the changes alleged in the Complaint are insignificant.   Owner otherwise denies the allegations contained in paragraph 75 of the Complaint.

76.     The allegation contained in paragraph 76 of the Complaint is an incomplete sentence and is therefore denied.

77.     Owner denies the allegations contained in paragraph 77 of the Complaint.

78.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract.   Owner otherwise denies the allegations contained in paragraph 78 of the Complaint.

79.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract. Owner otherwise denies the allegations contained in paragraph 79 of the Complaint.

80.     Owner denies the allegations contained in paragraph 80 of the Complaint.

81.     Owner denies the allegations contained in paragraph 81 of the Complaint.

82.     Owner denies the allegations contained in paragraph 82 of the Complaint.

83.     Owner denies the allegations contained in paragraph 83 of the Complaint.

84.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with this document or the terms of the Contract. Owner otherwise denies the allegations contained in paragraph 84 of the Complaint.

85.     Owner denies the allegations contained in paragraph 85 of the Complaint.

86.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract. Owner otherwise denies the allegations contained in paragraph 86 of the Complaint.

87.     Owner denies the allegations contained in paragraph 87 of the Complaint.

88.     Owner denies the allegations contained in paragraph 88 of the Complaint.

89.     Owner admits that the Contract speaks for itself and denies any allegations that are inconsistent with the Contract. Owner otherwise denies the allegations contained in paragraph 89 of the Complaint.

90.     Owner denies the allegations contained in paragraph 90 of the Complaint.

91.     Owner denies the allegations contained in paragraph 91 of the Complaint.

92.     Owner denies the allegations contained in paragraph 92 of the Complaint.

93.     Owner admits that the Agreement, including its Exhibits, speaks for itself and denies any allegations that are inconsistent with the Agreement and the other Contract Documents.   Owner denies the remaining allegations contained in paragraph 93 of the Complaint.

94.     Owner denies the allegations contained in paragraph 94 of the Complaint.

95.     Owner denies the allegations contained in paragraph 95 of the Complaint.

96.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 96 of the Complaint to the extent that they are inconsistent with the Contract Documents.

97.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 97 of the Complaint to the extent that they are inconsistent with the Contract Documents.  Owner otherwise denies the allegations contained in paragraph 97 of the Complaint.

98.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 98 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 98 of the Complaint.

99.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 99 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 99 of the Complaint.

100.    Owner denies the allegations contained in paragraph 100 of the Complaint.

101.    Owner denies the allegations contained in paragraph 101 of the Complaint.

102.    Owner denies the allegations contained in paragraph 102 of the Complaint.

103.    Owner denies the allegations contained in paragraph 103 of the Complaint.

104.    Owner denies the allegations contained in paragraph 104 of the Complaint.

105.    Owner denies the allegations contained in paragraph 105 of the Complaint.

106.    Owner denies the allegations contained in paragraph 106 of the Complaint.

107.    Owner denies the allegations contained in paragraph 107 of the Complaint.

108.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 108 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 108 of the Complaint.

109.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 109 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 109 of the Complaint.

110.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 110 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 110 of the Complaint.

111.     Owner denies the allegations contained in paragraph 111 of the Complaint.

112.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 112 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 112 of the Complaint.

113.     Owner admits that the Contract Documents speak for themselves and denies the allegations contained in paragraph 113 of the Complaint to the extent that they are inconsistent with the Contract Documents. Owner otherwise denies the allegations contained in paragraph 113 of the Complaint.

114.      Owner denies the allegations contained in paragraph 114 of the Complaint.

115.     Owner denies the allegations contained in paragraph 115 of the Complaint.

116.    Owner denies the allegations contained in paragraph 116 of the Complaint.

117.    Owner denies the allegations contained in paragraph 117 of the Complaint.

118.    Owner denies the allegations contained in paragraph 118 of the Complaint.

119.    Owner denies the allegations contained in paragraph 119 of the Complaint.

120.    Owner denies the allegations contained in paragraph 120 of the Complaint.

121.    Owner denies the allegations contained in paragraph 121 of the Complaint.

122.    Owner denies the allegations contained in paragraph 122 of the Complaint.

123.    Owner denies the allegations contained in paragraph 123 of the Complaint.

124.    Owner denies the allegations contained in paragraph 124 of the Complaint.

125.    Owner denies the allegations contained in paragraph 125 of the Complaint.

126.    Owner denies the allegations contained in paragraph 126 of the Complaint.

127.    Owner denies the allegations contained in paragraph 127 of the Complaint.

128.    Owner denies the allegations contained in paragraph 128 of the Complaint.

129.    Owner denies the allegations contained in paragraph 129 of the Complaint.

130.    Owner denies the allegations contained in paragraph 130 of the Complaint.

131.    Owner denies the allegations contained in paragraph 131 of the Complaint.

132.    Owner denies the allegations contained in paragraph 132 of the Complaint.

133.    Owner denies the allegations contained in paragraph 133 of the Complaint.

134.    Owner denies the allegations contained in paragraph 134 of the Complaint.

135.    Owner denies the allegations contained in paragraph 135 of the Complaint.

136.    Owner denies the allegations contained in paragraph 136 of the Complaint.

137.    Owner denies the allegations contained in paragraph 137 of the Complaint.

138.    Owner denies the allegations contained in paragraph 138 of the Complaint.

139.   Owner denies the allegations contained in paragraph 139 of the Complaint.

140.   Owner denies the allegations contained in paragraph 140 of the Complaint.

141.   Owner denies the allegations contained in paragraph 141 of the Complaint.

142.   Owner denies the allegations contained in paragraph 142 of the Complaint.

143.   Owner denies the allegations contained in paragraph 143 of the Complaint.

144.   Owner denies the allegations contained in paragraph 144 of the Complaint.

145.   Owner denies the allegations contained in paragraph 145 of the Complaint.

146.   Owner denies the allegations contained in paragraph 146 of the Complaint.

147.   Owner denies the allegations contained in paragraph 147 of the Complaint.

148.   Owner denies the allegations contained in paragraph 148 of the Complaint.

149.   Owner denies the allegations contained in paragraph 149 of the Complaint.

150.   Owner denies the allegations contained in paragraph 150 of the Complaint.

151.   Owner denies the allegations contained in paragraph 151 of the Complaint.

152.   Owner denies the allegations contained in paragraph 152 of the Complaint.

153.   Owner denies the allegations contained in paragraph 153 of the Complaint.

154.   Owner denies the allegations contained in paragraph 154 of the Complaint.

155.   Owner denies the allegations contained in paragraph 155 of the Complaint.

156.   Owner denies the allegations contained in paragraph 156 of the Complaint.

157.   Owner denies the allegations contained in paragraph 157 of the Complaint.

158.   Owner denies the allegations contained in paragraph 158 of the Complaint.

159.   Owner denies the allegations contained in paragraph 159 of the Complaint.

160.   Owner denies the allegations contained in paragraph 160 of the Complaint.

161.   Owner denies the allegations contained in paragraph 161 of the Complaint.

162.    Owner denies the allegations contained in paragraph 162 of the Complaint.

163.    Owner denies the allegations contained in paragraph 163 of the Complaint.

164.    Owner denies the allegations contained in paragraph 164 of the Complaint.

165.    Owner denies the allegations contained in paragraph 165 of the Complaint.

166.    Owner denies the allegations contained in paragraph 166 of the Complaint.

167.    Owner denies that it is liable to Contractor in any way or that it is responsible for the issues set forth in Paragraph 167 of the Complaint.  Owner denies the remaining allegations in paragraph 167 of the Complaint.

168.    Owner denies the allegations contained in paragraph 168 of the Complaint.

169.    Owner admits that the Contract Documents speak for themselves and deny any allegations that are inconsistent with those Contract Documents.  Owner denies the remaining allegation contained in paragraph 169 of the Complaint.

170.    Owner denies the allegations contained in paragraph 170 of the Complaint.

171.    Owner denies the allegations contained in paragraph 171 of the Complaint.

172.    Owner denies the allegations contained in paragraph 172 of the Complaint.

173.    Owner denies the allegations contained in paragraph 173 of the Complaint.

174.    Owner denies the allegations contained in paragraph 174 of the Complaint.

175.    Owner denies the allegations contained in paragraph 175 of the Complaint.

176.    Owner denies the allegations contained in paragraph 176 of the Complaint.

177.    Owner denies the allegations contained in paragraph 177 of the Complaint.

178.    Owner denies the allegations contained in paragraph 178 of the Complaint.

179.    Owner denies the allegations contained in paragraph 179 of the Complaint.

180.    Owner denies the allegations contained in paragraph 180 of the Complaint.

181.    Owner denies the allegations contained in paragraph 181 of the Complaint.

182.    Owner denies the allegations contained in paragraph 182 of the Complaint.

183.    Owner denies the allegations contained in paragraph 183 of the Complaint.

184.    Owner denies the allegations contained in paragraph 184 of the Complaint.

185.    Owner denies the allegations contained in paragraph 185 of the Complaint.

186.    Owner denies the allegations contained in paragraph 186 of the Complaint.

187.    Owner denies the allegations contained in paragraph 187 of the Complaint.

188.    Owner denies the allegations contained in paragraph 188 of the Complaint.

189.    Owner denies the allegations contained in paragraph 189 of the Complaint.

190.    Owner denies the allegations contained in paragraph 190 of the Complaint.

191.    Owner denies the allegations contained in paragraph 191 of the Complaint.

192.    Owner denies the allegations contained in paragraph 192 of the Complaint.

193.    Owner denies the allegations contained in paragraph 193 of the Complaint.

194.    Owner denies the allegations contained in paragraph 194 of the Complaint.

195.    Owner denies the allegations contained in paragraph 195 of the Complaint.

196.    Owner denies the allegations contained in paragraph 196 of the Complaint.

197.    Owner denies the allegations contained in paragraph 197 of the Complaint.

198.    Owner denies the allegations contained in paragraph 198 of the Complaint.

199.    Owner denies the allegations contained in paragraph 199 of the Complaint.

200.    Owner denies the allegations contained in paragraph 200 of the Complaint.

201.    Owner denies the allegations contained in paragraph 201 of the Complaint.

202.    The allegation in the second sentence of paragraph 202 is vague and lacks the necessary context for Owner to respond and is therefore denied. Owner denies the remaining allegations contained in paragraph 202 of the Complaint.

203.    The allegation in paragraph 203 lacks the necessary context for Owner to respond and is therefore denied.

204.    Owner denies the allegations contained in paragraph 204 of the Complaint.

205.    Owner denies the allegations contained in paragraph 205 of the Complaint.

206.    Owner denies the allegations contained in paragraph 206 of the Complaint.

207.    Owner denies the allegations contained in paragraph 207 of the Complaint.

208.    Owner denies the allegations contained in paragraph 208 of the Complaint.

209.    Owner denies the allegations contained in paragraph 209 of the Complaint.

210.    Owner denies the allegations contained in paragraph 210 of the Complaint.

211.    Owner denies the allegations contained in paragraph 211 of the Complaint.

212.    Owner denies the allegations contained in paragraph 212 of the Complaint.

213.    Owner denies the allegations contained in paragraph 213 of the Complaint.

214.    Owner denies the allegations contained in paragraph 214 of the Complaint.

215.    Owner denies the allegations contained in paragraph 215 of the Complaint.

216.    Owner denies the allegations contained in paragraph 216 of the Complaint.

217.    Owner denies the allegations contained in paragraph 217 of the Complaint.

218.    Owner denies the allegations contained in paragraph 218 of the Complaint.

219.    Owner denies the allegations contained in paragraph 219 of the Complaint.

220.    Owner denies the allegations contained in paragraph 220 of the Complaint.

221.    Owner denies the allegations contained in paragraph 221 of the Complaint.

222.    Owner denies the allegations contained in paragraph 222 of the Complaint.

223.    Owner denies the allegations contained in paragraph 223 of the Complaint.

224.    Owner denies the allegations contained in paragraph 224 of the Complaint.

225.    Owner denies the allegations contained in paragraph 225 of the Complaint.

226.    Owner denies the allegations contained in paragraph 226 of the Complaint.

227.    Owner denies the allegations contained in paragraph 227 of the Complaint.

228.    Owner denies the allegations contained in paragraph 228 of the Complaint.

229.    Owner denies the allegations contained in paragraph 229 of the Complaint.

230.    Owner denies the allegations contained in paragraph 230 of the Complaint.

231.    Owner denies the allegations contained in paragraph 231 of the Complaint.

232.    Owner denies the allegations contained in paragraph 232 of the Complaint.

233.    Owner denies the allegations contained in paragraph 233 of the Complaint.

234.    Owner denies the allegations contained in paragraph 234 of the Complaint.

235.    Owner denies the allegations contained in paragraph 235 of the Complaint.

236.    Owner denies the allegations contained in paragraph 236 of the Complaint.

237.    Owner denies the allegations contained in paragraph 237 of the Complaint.

238.    Owner denies the allegations contained in paragraph 238 of the Complaint.

239.    Owner denies the allegations contained in paragraph 239 of the Complaint.

240.    Owner denies the allegations contained in paragraph 240 of the Complaint.

241.    Owner denies the allegations contained in paragraph 241 of the Complaint.

242.    Owner denies the allegations contained in paragraph 242 of the Complaint.

243.    Owner denies the allegations contained in paragraph 243 of the Complaint.

244.    Owner denies the allegations contained in paragraph 244 of the Complaint.

245.     Owner admits that, on or about March 17, 2015, Owner and Contractor executed a Change Order extending the Contract Time for five (5) days.   Owner denies the remaining allegations contained in paragraph 245 of the Complaint.

246.     Owner denies the allegations contained in paragraph 246 of the Complaint.

247.     Owner admits that Contractor submitted a document to Owner, which is dated February 8, 2016 and to which Contractor refers to as "TIA-1" in the Complaint, but denies that "TIA-1" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-1" complies with or satisfies the terms, conditions and requirements of the Agreement.   Owner otherwise denies the allegations contained in paragraph 247 of the Complaint.

248.     Owner admits that Contractor submitted a document to Owner, dated July 8, 2016 and to which Contractor refers to as "TIA-2" in the Complaint, but denies that "TIA-2" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-2" complies with or satisfies the terms, conditions and requirements of the Agreement.   Owner otherwise denies the allegations contained in paragraph 248 of the Complaint.

249.     Owner admits that Contractor submitted a document to Owner that Contractor refers to as "TIA-3" in the Complaint, but denies that "TIA-3" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-3" complies with or satisfies the terms, conditions and requirements of the Agreement. Owner otherwise denies the allegations contained in paragraph 249 of the Complaint.

250.     Owner admits that Contractor submitted a document to Owner that Contractor refers to as "TIA-4" in the Complaint, but denies that "TIA-4" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-4" complies with or satisfies the terms, conditions and

requirements of the Agreement. Owner otherwise denies the allegations contained in paragraph 250 of the Complaint.

251.    Owner admits that Contractor submitted a document to Owner, dated February 29, 2017, that Contractor refers to as "TIA-5" in the Complaint, but denies that "TIA-5" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-5" complies with or satisfies the terms, conditions and requirements of the Agreement. Owner otherwise denies the allegations contained in paragraph 251 of the Complaint.

252.    Owner admits that Contractor submitted a document to Owner, dated February 28, 2017, which Contractor refers to as "TIA-6" in the Complaint, but denies that "TIA-6" is a legitimate and valid Claim for purposes of the Agreement or that "TIA-6" complies with or satisfies the terms, conditions and requirements of the Agreement.  Owner otherwise denies the allegations contained in paragraph 252 of the Complaint.[1]

253.    Owner admits that Contractor submitted a document to Owner, dated July 25, 2017, which Contractor refers to as "TIA-7" in the Complaint, but denies that "TIA-7" is a legitimate Claim for purposes of the Agreement or that "TIA-7" complies with or satisfies the terms, conditions and requirements of the Agreement.  Owner otherwise denies the allegations contained in paragraph 253 of the Complaint.

254.    Owner denies the allegations contained in paragraph 254 of the Complaint.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

255.    Owner repeats and re-alleges it answers to the allegations contained in paragraphs 1 through 254 as if fully set forth herein.

---

[1]     Owner admits that a flooding event occurred on or about February 2, 2017 that Delayed the Project.  Owner denies the remaining allegations set forth in n.1.

256.    Owner denies the allegations contained in paragraph 256 of the Complaint.

257.    Owner denies the allegations contained in paragraph 257 of the Complaint.

258.    Owner denies the allegations contained in paragraph 258 of the Complaint and specifically denies that Contractor is entitled to any relief whatsoever from Owner and denies that Contractor is entitled to a judgment against Owner.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

259.    Owner repeats and re-alleges it answers to the allegations contained in paragraphs 1 through 254 as if fully set forth herein.

260.    Paragraph 260 of the Complaint contains legal conclusions to which no response is required and they are therefore denied.

261.    Owner denies the allegations contained in paragraph 261 of the Complaint and all of its subparagraphs.

262.    Owner denies the allegations contained in paragraph 262 of the Complaint.

263.    Owner denies the allegations contained in paragraph 263 of the Complaint and specially denies that Contractor is entitled to any relief whatsoever from Owner and denies that Contractor is entitled to a judgment against Owner.

**<u>AFFIRMATIVE AND OTHER DEFENSES</u>**

Owner hereby repeats, realleges, and incorporates herein by reference its responses to the allegations in paragraphs 1 through 263 of the Complaint and pleads its Affirmative and Other Defenses, without assuming the burden of proof when the law places that burden upon Contractor, and without prejudice to its Amended Answer, as follows:

### First Defense

Contractor's claims are barred, in whole or in part, under the doctrine of set-off and/or recoupment for the damages sustained by Owner as a result of Contractor's failure to fulfill its contractual obligations, including, but not limited to, Contractor's failure to achieve Substantial Completion of its Work within the Contract Time, and Contractor's failure to perform its work in accordance with the Contract.

### Second Defense

Contractor's claims are barred, in whole or in part, under the doctrine of wavier as a result of Contractor's failure to provide proper notice under the Contract, Contractor's failure to prepare, and deliver to Owner, any Claim for an increase to the Guaranteed Maximum Price or an extension of the Contract Time that was compliance with the terms, conditions and requirements of Section 4.7.1, and Contractor's failure to comply with conditions precedent.

### Third Defense

Contractor's claims are barred, in whole or in part, under the doctrine of release as a result of Contractor's release of claims because, among other things, Contractor failed to provide proper notice under the Contract, Contractor failed to prepare, and deliver to Owner, any Claim for an increase to the Guaranteed Maximum Price or an extension of the Contract Time that was compliance with the terms, conditions and requirements of the Contract, including Section 4.7.1 of the Agreement, Contractor's execution of Change Orders (encompassing now disputed Work) fully adjusting the Guaranteed Maximum Price and the Contract Time relative to the subject matter of the Change Order, and performing a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative which, pursuant to the Agreement, constitutes Contractor's acceptance that the change in the Work

performed is included as part of the Contract Time and the then current Guaranteed Maximum Price.

## Fourth Defense

Contractor's claims are barred, in whole or in part, due to Contractor's failure to satisfy conditions precedent insofar as Contractor failed to satisfy the contractual conditions precedent to preserving and perfecting any purported Claims for an increase to the Guaranteed Maximum Price or an extension of the Contract Time as required by the Contract.

## Fifth Defense

Contractor's claims are barred, in whole or in part, under the doctrine of payment and satisfaction insofar as Contractor has been fully compensated in accordance with the terms of the Contract, including, but not limited to, through the execution of Change Orders fully adjusting the Guaranteed Maximum Price and the Contract Time relative to the subject matter of the Change Order, and performing a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative which, pursuant to the Agreement, constitutes Contractor's acceptance that the change in the Work performed is included as part of the Contract Time and the then current Guaranteed Maximum Price.

## Sixth Defense

Contractor is barred from seeking any relief for its alleged losses insofar as its alleged losses, if any, are caused by and attributable to Contractor's own conduct, including, but not limited to, Contractor's failure to perform the Work in accordance with the Contract, Contractor's failure to complete the Work within the Contract Time, and including, but not limited to, through the execution of Change Orders fully adjusting the Guaranteed Maximum Price and the Contract Time relative to the subject matter of the Change Order, and Contractor's

decision to perform a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative which, pursuant to the Agreement, constitutes Contractor's acceptance that the change in the Work performed is included as part of the Contract Time and the then current Guaranteed Maximum Price.

### Seventh Defense

Contractor's claims are barred, in whole or in part, under the doctrine of excuse insofar as Contractor was the first breaching party, thereby excusing Owner's performance.

### Eighth Defense

Contractor's claims are barred, in whole or in part, under the doctrine of estoppel insofar as Contractor made certain warranties and representations concerning its review of the plans for constructability, Contractor's ability to complete its Work in accordance with the Contract Time, and Contractor's ability to perform the work in accordance with the Contract Documents, upon which Owner relied upon to its detriment.  Contractor is also estopped from asserting any claims for an extension of the Contract Time or an increase in the Guaranteed Maximum Price based on any Work that was the subject of a Change Order as Change fully adjust the Guaranteed Maximum Price and the Contract Time relative to the subject matter of the Change Order, and to the extent that Contractor performed a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative which, pursuant to the Agreement, constitutes Contractor's acceptance that the change in the Work performed is included as part of the Contract Time and the then current Guaranteed Maximum Price.

### Ninth Defense

Contractor's claims are barred, in whole or in part, due to Contractor's failure to mitigate insofar as Contractor failed to lessen or avoid its losses by failing to properly discharge its obligations under the Contract and in accordance with the applicable standard of care.

### Tenth Defense

Contractor's claims are barred, in whole or in part, due to Contractor's failure to state a claim upon which relief may be granted.

### Eleventh Defense

Contractor's claims are barred, in whole or in part, due to the doctrine of accord and satisfaction because, among other things, Contractor executed Change Orders (encompassing now disputed Work) which fully adjusted the Guaranteed Maximum Price and the Contract Time relative to the subject matter of the Change Orders, and Contractor performed a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative, and, in doing so, pursuant to the Agreement, Contractor accepted that the change in the Work it performed was included as part of the Contract Time and the then current Guaranteed Maximum Price.

### DEFENDANT'S COUNTERCLAIMS AGAINST PLAINTIFF

Defendant PRH NE 31st Street, LLC, a Florida limited liability company ("Owner" or "PRH") sues Plaintiff Plaza Construction Group Florida, LLC, a Delaware limited liability company ("Contractor" or "Plaza") for breach of contract (Count I) and declaratory relief (Count II) as set forth below.

## PARTIES, JURISDICTION AND VENUE

1.      Contractor initiated this lawsuit by filing the Complaint on August 24, 2017 in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "State Action").

2.      Owner timely removed the State Action to the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. §§ 1441 and 1446, on August 30, 2017.

3.      Owner is a Florida limited liability company with its principal place of business located in Miami-Dade County, Florida.

4.      Contractor is a Delaware limited liability company with its principal place of business in New York, New York.

5.      Owner and Contractor are citizens of different States.

6.      This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, attorneys' fees and costs.

7.      The Court has jurisdiction over Owner's counterclaims against Contractor under 28 U.S.C. §§ 1332 and 1367.

8.      Venue is proper in Miami-Dade County, Florida, because the improvements to real property at issue are located there and the Contract between Owner and Contractor that is the subject of this action mandates that the sole and exclusive jurisdiction and venue for any litigation arising out of such contract or the improvements to real property at issue shall be the state and federal courts in and for Miami-Dade County, Florida.

9.      All conditions precedent to filing these counterclaims have been performed, have occurred, or have been waived or otherwise satisfied.

## FACTUAL ALLEGATIONS

10.     This dispute arises out of a written Construction Agreement between Owner and Contractor dated November 2014 (the "Agreement")[2] for the construction of Paraiso Bay, a fifty-three (53) story, luxury, high rise condominium (the "Project") located at 650 NE 31st Street, Miami, Florida 33137 (the "Site").  The Project includes approximately one million gross square feet of improvements to the Site, consisting of three hundred sixty-eight (368) residential condominium Units, and various Common Areas, such as a parking garage, an entrance lobby, a porte cochere, a pedestal style pool deck, two pools, a spa, various water features, a barbeque area and an amenities level consisting of a gym, changing rooms, a party room, a business center and other related luxury amenities.

11.     Owner is the record developer of the Project and Contractor is the licensed general contractor that contracted with Owner to build the Project.

### I.      THE CONTRACT

12.     Beginning in early 2014 and continuing through the date that Owner and Contractor executed the Agreement, Contractor performed certain preconstruction services for Owner in connection with the Project, which included extensive review and commentary upon the Plans[3] for the Project, the solicitation  of subcontractor and supplier interest in the Project,

---

[2]      A true and complete copy of the Agreement is attached hereto as Exhibit 1.  For the sake of brevity, all capitalized terms used herein will have the meanings ascribed to them in the Agreement unless otherwise defined herein.

[3]      The Agreement defines the term "Plans" as follows:

> "[t]hat part of the Contract Documents prepared or approved by Architect which graphically shows the scope, extent, and character of the Work to be performed by Contractor and that part of the Contract Documents consisting of written technical descriptions of materials, equipment systems, standards, and workmanship as applied to the Work and certain administrative details applicable

the preparation of bid packages for proposed subcontractors and suppliers, the negotiation of pricing and scopes of work with various subcontractors and suppliers, cost estimating, cost analysis and a value engineering analysis of the Project's design.  Contractor's preconstruction services were intended to develop an understanding of the Project and the most time and cost efficient plan for the Project's construction consistent with Owner's quality requirements, such that the Project would be completed and ready for occupancy at the earliest possible time, and coordinated and constructed with the most efficient use of materials and methods to provide the highest and best quality for Owner.

13.     Because the Project was going to be constructed on a "fast track" basis and with the benefit of Contractor's preconstruction planning and input, the Plans provided to Contractor as part of its preconstruction services were still under development and not yet finalized.  That is to say that Contractor understood and agreed to perform its preconstruction services and begin construction of the Project before a final set of fully coordinated Plans was complete.

14.     When the preconstruction services began, when construction began, and at the time of contracting, the Plans were sufficiently complete to commence construction of the Project, and Contractor understood that revisions and supplements to the Plans were going to be provided to Contractor after it commenced construction and after the Parties executed the Agreement.  Thus, a critical objective of Contractor's preconstruction services was to sufficiently develop a Guaranteed Maximum Price and Construction Schedule that accounted for and included sufficient costs and time for all of the labor, materials, equipment and services that were necessary to construct the entire Project, including Work required by future Plan revisions and supplements.

---

hereto, . . . which may be amended from time to time as provided by this Agreement. . . ."  Ex.1 at § 1.2.43.

15.     On September 2, 2014, while Contractor was performing preconstruction services for Owner and the Plans for the Project were being prepared, Contractor commenced construction of the Work.[4]  *See* Ex. 1 at § 3.1.

16.     In November 2014, more than six (6) months after Contractor began performing preconstruction services, Owner and Contractor executed the Agreement.[5]   The fact that Contractor had previously performed preconstruction services for Owner for more than six (6) months, and in doing so, had gained an understanding of, and familiarity, with the Project, including the Plans that Contractor would use to build it, was a material inducement to Owner's decision to execute the Agreement.

---

[4]     The Agreement defines the term "Work," in relevant part, as follows:

> "[t]he entire completed construction of the Project, which Contractor shall perform pursuant to this Agreement and the other Contract Documents.  Work includes, and is the result of, (i) performing or providing all labor, services, and documentation necessary to construct the Project, including the Units and the Common Areas, and (ii) furnishing, installing, and incorporating all materials, furniture, fixtures and equipment into the construction of the entire Project (including the Units and the Common Areas), all as required by the Contract Documents; . . . The Work includes all of the labor, materials and services that Contractor furnished on the Project and to the Site prior to the Effective Date of this Agreement."

Ex. 1 at § 1.2.61.

[5]     Like most construction contracts, the rights and obligations of Owner and Contractor are established by all of the "Contract Documents," as defined in Section 1.2.14 of the Agreement. The Agreement (including all of its exhibits), the Plans (as defined in the Agreement) and all of the documents listed on Exhibit E to the Agreement are Contract Documents and the Contract Documents form the "Contract" between Owner and Contractor.  *See* Ex. 1 at § 1.2.14. Given the volume of Contract Documents and the possibility for conflicts, inconsistencies or discrepancy between and among them, Owner and Contractor agreed that the Contract Documents that imposes the most stringent requirement on Contractor would control in the event of such a conflict, inconsistency or discrepancy.  *Id.* at § 1.3.5.

A.     The Work, the Contract Documents, the GMP and the Contract Time

17.     In the Agreement, Contractor agreed to complete all of the Work required by the Contract[6] for the Guaranteed Maximum Price[7] of One Hundred Fifteen Million Ninety-Five Thousand Five Hundred Thirty-Three and 00/100 Dollars ($115,095,533.00). *See* Ex. 1 at §§ 1.2.29, 2.1, & 4.1.

18.     Contractor stipulated in the Agreement that it commenced the Work on September 2, 2014 (prior to the execution of the Agreement) and agreed to achieve Substantial Completion of the entire Work by January 19, 2017 and Final Completion of the entire Contract by March 20, 2017.  *Id*. at § 3.1 and Ex. G thereto.

19.     In Section 3.2 of the Agreement, Contractor agreed that: (i) "Contractor shall diligently prosecute the Work in accordance with the Construction Schedule . . ."; (ii) "Contractor shall achieve Substantial Completion of the Work within the Contract Time[8];" and (iii) "THE CONTRACT TIME IS OF THE ESSENCE."  *Id*. at § 3.2.

20.     While the Agreement expressly provided that the Contract Time is of the essence, the Contract did not require that Contractor complete any particular Work activity within any

---

[6]     The term "Contract" for purposes of Owner's Counterclaims shall mean and include the Agreement and all other Contract Documents.

[7]     The Guaranteed Maximum Price is "[t]he total maximum cost to be paid by Owner for Contractor's full and complete performance under the Contract Documents, including, without limitation, Contractor's full and complete performance of the Work, all services of Contractor under this Agreement, furnishing of all labor, materials, and equipment necessary to construct the Work and all fees, compensation and reimbursements to Contractor."  *Id*. at § 1.2.29.  The term "GMP" shall mean and refer to the Guaranteed Maximum Price.

[8]     The Agreement defines the Contract Time as "[t]he number of days or the dates stated in the Construction Schedule (attached [to the Agreement] as **Exhibit 'D'**) within, or by, which Contractor shall achieve Substantial Completion of the Work."  *Id*. at § 1.2.15.  The Agreement's Construction Schedule (Exhibit D) states that "Contractor shall achieve Substantial Completion of the Work by January 19, 2017."  *Id*. at Ex. G.  Hence, the Contract Time is the time between the date that Contractor commenced the Work (September 2, 2014) and the Contract's deadline to achieve Substantial Completion, which the Parties agreed was January 19, 2017.  *Id*.

particular period of time or guarantee Contractor a particular period of time to complete any particular activity. Rather, the Agreement defined only a Contract Time and established it as the period of time "within, or by, which, Contractor shall achieve Substantial Completion of the Work," and as the standard against which Contractor's overall performance is to be judged.

21.     Given that Contractor was going to construct the Project on a fast track basis and that the Plans were under development at the time the Parties executed the Agreement, the Agreement contemplated that revisions to the Plans and other Contract Documents would be issued subsequent to the execution of the Agreement, and thus after agreement on the GMP and the Contract Time. Indeed, the Agreement contemplated these facts and allocated the risks of the issuance of new Plans and/or revisions to Plans accordingly.

22.     For example, the Contract's GMP included various Allowances[9] for certain portions/items of the Work, which the Parties designated as "Allowance Items"[10] and listed on Exhibit "B" to the Agreement. *See* Ex. 1 at Ex. B thereto. The Agreement specified a process by which the GMP (but not the Contract Time) would be adjusted by Change Order once the Parties liquidated the Cost of the Work for each Allowance Item. Specifically, the Agreement provides, in relevant part, at Sections 4.1.4.2, 4.1.4.3 and 4.1.4.4, as follows:

> "Unless otherwise specifically noted on **Exhibit "B**," the Allowance for each Allowance Item is limited to the cost to purchase, handle, and install the Allowance Item, which cost shall include Subcontractor's or Supplier's mark-up. . . .

---

[9]     The Agreement defines an "Allowance" as "[t]he allowable Cost of the Work for certain portion/items of the Work . . . identified and described on Exhibit B [to the Agreement] . . ." Ex. 1 at § 1.2.1.

[10]     The Agreement defines "Allowance Items" as the portions/items of the Work for which the GMP includes an Allowance and limited the Allowance Items to only those specifically identified on Exhibit B to the Agreement.   *See id*. at § 4.1.4.1 ("[t]he Cost of the Work portion of the Guaranteed Maximum Price includes specific Allowances for certain portions/items of the Work (the 'Allowance Items') as shown on **Exhibit 'B'**. The only Allowance Items shall be those specifically identified as such in **Exhibit 'B'**.").

> Owner and Contractor shall jointly bid and negotiate all Subcontracts and/or purchase orders for the Allowance Items. Contractor shall diligently pursue finalizing the Subcontracts and/or purchase orders for the Allowance Items. Contractor shall promptly execute a Subcontract and/or purchase order, as appropriate, for an Allowance Item upon Owner and Contractor finalizing the actual Cost of the Work for the Allowance Item.
>
> Whenever the actual and direct Cost of the Work for an Allowance Item is more or less than the corresponding Allowance for such Allowance Item stated in **Exhibit "B**", then the Guaranteed Maximum Price shall be adjusted accordingly by Change Order.  The amount of the Change Order shall reflect the difference between the actual and direct Cost of the Work incurred by Contractor to purchase, handle and install the Allowance Item and the corresponding Allowance for such Allowance Item set forth in Exhibit 'B.'"

Ex. 1 at §§ 4.1.4.2, 4.1.4.3 and 4.1.4.4.

23.     Importantly, all Allowance Items are part of the Work, and hence, Contractor was required to achieve Substantial Completion of all of them, together with the remainder of the Work, prior to the expiration of the Contract Time.  *See* Ex. 1 at § 4.1.4.1 ("[t]he Cost of the Work portion of the Guaranteed Maximum Price includes specific Allowances *for certain portions/items of the Work (the 'Allowance Items')*) (emphasis added); *see also id.* at § 1.2.1 ("Allowances -- The allowable Cost of the Work *for certain portion/items of the Work* . . . identified and described on Exhibit B [to the Agreement] . . .") (emphasis added); and *id.* at § 3.2 ("Contractor shall achieve Substantial Completion of the Work within the Contract Time.") (emphasis added).  In fact, the Agreement contemplated an adjustment to the GMP once the Parties solidified the actual Cost of the Work for an Allowance item, but did not contemplate an adjustment of the Contract Time for Allowance Items.  The Parties always agreed that the Allowance Items were part of the Work and Contractor was required to Substantially Complete Allowance Items within the Contract Time.

24.     Some of the agreed upon Allowance Items were labor, materials, equipment and services that would be required by supplemental, amended or revised Plans issued to Contractor after the Effective Date of the Agreement.  For example, at the time of contracting, the Parties understood that the Work would include furnishing and installing finishes throughout the interiors of the Units and Common Areas, but the interior design Plans – which would describe all of the finishes (floorings, millwork, wallpaper, doors, paint, hardware, glass partitions, decorative light fixtures, etc.) throughout the entirety of the Project's lobby and amenity level -- had not yet been prepared at the time the Parties executed the Agreement.  *See id*. at Ex. E. Nevertheless, Contractor agreed to furnish and install -- as an Allowance Item and, hence, within the Contract Time -- all of the finishes in the lobby and amenity level required by interior design Plans that Contractor would receive after execution of the Agreement and the GMP included an Allowance in the amount of $996,755 as compensation for this Work.  *See, e.g.*, Ex. 1 at Ex. G, p. G-3 ("[t]he GMP includes an allowance for the Drop-off/Lobby Level build-out and Amenities level 5 build-out (i.e. for build-out for future fitness, business cent[er], club room, etc.). Refer to the Allowances – Exhibit 'B'."); *see also id*. at p. G-11 ("[t]he GMP assumes common areas millwork is included in the Lobby Finishes Allowance" . . . "[t]he GMP assumes a Reception Desk is included in the Lobby Finishes Allowances."); *see also id*. at Ex. B, p. B-3.

25.     Similarly, the Parties agreed that all of the labor, material, equipment and services required by the Plan revision set titled "Addendum No. 3" and any revisions to the Plans that were necessary for the issuance of the Project's building permit were also Allowance Items and the GMP included Allowances for these portions of the Work as well.  *See* Ex. 1 at Ex. B, p. B-4. Thus, Contractor agreed to construct all of the Work required by Addendum No. 3 and permit Plan revisions without any additional Contract Time.

26.     The Agreement specifically contemplated that the Contract Documents would be further developed during the course of construction to further define the Allowance Items and to include other information that was unavailable to Contractor as of the Effective Date of the Agreement.  The Agreement stated, in relevant part, at Section 2.2, as follows:

> The intent of the Contract Documents is to include all items necessary for the completion of the Work.  The Contract Documents are complementary and what is required by one shall be required by all.  ***Contractor contemplates that the Contract Documents will be expanded or modified during the course of construction of the Project to include information (the "Additional Information") that is not available as of the Effective Date of this Agreement and shall be provided to Contractor after the Effective Date of this Agreement***.

*See* Ex. 1. at § 2.2 (emphasis added).

27.     At the time of contracting, Contractor knew the Project was to be constructed on a "fast track" basis, knew the Plans were still under development, and voluntarily executed the Agreement, representing and warranting to Owner, among other things, the following:

> 7.1.1   Contractor is duly organized, validly existing and in good standing under the laws of both the state of its incorporation and the State of Florida and it has the full right, power and authority to execute, deliver and carry out the terms and provisions of this Agreement;

> 7.1.4   Contractor is not aware of any impediments or conditions that would prevent Contractor from commencing the Work and Substantially Completing the Work within the Contract Time;

> 7.1.5   Contractor is experienced, duly licensed as a general contractor in the State of Florida and skilled in the Work to be performed by Contractor hereunder;

> 7.1.6   Contractor has relied upon and carefully examined the Contract Documents, including, but not limited to, all Plans incorporated therein, and agrees that the Contract Documents are adequate and sufficient for the commencement of the Work;

> 7.1.9   Contractor does not consider that any further examinations, investigations, explorations, tests, studies, or data are necessary for the performance of the Work at the Guaranteed Maximum Price, within the Contract Time, and in accordance with the other terms and conditions of the Contract Documents;

7.1.11 Contractor has given Owner written notice of all conflicts, errors, ambiguities, or discrepancies that Contractor has discovered in the Contract Documents;

7.1.12 all materials required by Contractor to perform the Work have already been received or, if not received, will be ordered in a timely fashion, in order to permit the timely completion of the Work;

7.1.13 Contractor can Substantially Complete the Work within the Contract Time for the Guaranteed Maximum Price;

Ex. 1 at §§ 7.1.1, 7.1.4, 7.1.5, 7.1.6, 7.1.9, 7.1.11, 7.1.12, & 7.1.13.

        B.       <u>Owner's Right to Change the Work</u>

28.    The Agreement contemplates and permits Owner to change the Work during Contractor's performance of the Contract, obligates Contractor to promptly perform all changes in the Work, specifies the circumstances under which Contractor would (and would not) be entitled to an adjustment of the GMP and/or the Contract Time for a change in the Work, and sets forth a specific procedure for changing the Work and adjusting the GMP and/or the Contract Time due to a change in the Work, if appropriate.  The Agreement provides, in relevant part, as follows:

1.2.7  *Change Directive* – A written statement to Contractor from, and signed by, Owner, in the form attached [to the Agreement] as **Exhibit "Q**.**"** issued on or after the Effective Date of this Agreement ordering a change in the Work prior to agreement on adjustment, if any, in the Guaranteed Maximum Price (as defined below) or the Contract Time (as defined herein), or both.  A Change Directive will not, and shall not, adjust the Guaranteed Maximum Price or the Contract Time, but is evidence that the Parties expect that the change in the Work ordered and documented by a Change Directive shall be incorporated in a subsequently issued Change Order following agreement by the Parties as to its effect, if any, on the Guaranteed Maximum Price and/or the Contract Time.

1.2.8  *Change Order* – A document issued on or after the Effective Date of this Agreement that is signed by Contractor and Owner, in the form attached [to the Agreement] as **Exhibit "P**,**"** which authorizes a change in the Work or an adjustment in the Guaranteed Maximum Price and/or an adjustment of the Contract Time.

34

1.2.22  *Field Order* – A written order issued by Owner after the Effective Date of this Agreement that requires minor changes in the Work, but which does not involve a change in the Guaranteed Maximum Price or the Contract Time.

1.2.61  *Work* – . . . the scope and extent of the Work may be changed, expanded, modified, or reduced pursuant to the terms of this Agreement. . .

2.3     All changes in the Work resulting from (i) defective or non-conforming Work, (ii) the mistakes, errors or omissions of Contractor, or (iii) the mistakes, errors or omissions of Contractor's employees, agents, Subcontractors, Suppliers, independent contractors or any other Person performing a portion of the Work through, or under, Contractor, shall be performed by Contractor at no charge to Owner, other than available Contractor's Contingency.

4.8.1   The Work may be changed, expanded or reduced by a Field Order, Change Directive or Change Order.  Owner may, without invalidating this Agreement, order changes in the Work consisting of additions, deletions, substitutions, or other revisions in the Work, by Field Order, Change Directive or Change Order.  *Appropriate adjustments to the Guaranteed Maximum Price and/or the Contract Time made as a result of a change in the Work shall only be made by Change Order and only in accordance with this Section 4.8.*  If a change in the Work requires an adjustment to the Contract Time, then such adjustment to the Contract Time shall be documented in the same Change Order that documents the change in the Work. Contractor shall perform changes in the Work in accordance with the Contract Documents.  Contractor shall promptly perform the change in the Work, unless otherwise provided in the Change Order, Change Directive or Field Order ordering such change in the Work.

4.8.3   If Contractor proceeds to perform a change in the Work without a Change Directive or a Change Order or other written directive issued by Owner or Owner's Representative, then such performance shall constitute Contractor's acceptance that the change in the Work performed is included as part of the Contract Time and the then current Guaranteed Maximum Price.

4.8.4   *No later than three (3) weeks after the issuance of a potential revision to the Contract Documents*, whether issued by a response to Contractor's request for information ("RFI"), a Shop Drawings comment, a Plan revision, a sketch, a supplemental instruction from Architect, a modification to this Agreement or otherwise (collectively, the "Supplemental Information"), *Contractor shall provide Owner with written notice of a Potential Change Order ("PCO")* that includes Contractor's potential requested adjustment to the GMP (if any) and the potential requested adjustment to the Contract Time (if any) caused by or arising out of the Supplemental Information. Immediately after receipt of Supplemental Information, Contractor shall provide such Supplemental Information to the applicable and appropriate Subcontractors and Suppliers.  *For each PCO submitted to Owner, Contractor shall prepare and submit a corresponding*

*Change Order Request ("COR") to Owner no later than ten (10) days after the date that Contractor submitted the corresponding PCO to Owner. Each of Contractor's CORs shall state the actual adjustment to the GMP and the Contract Time requested by Contractor by reason of the Supplemental Information giving rise to the COR and the corresponding PCO. . . .* Contractor shall provide Owner with any other documentation, back-up or support substantiating a COR reasonably requested by Owner. *Contractor shall not be entitled to an adjustment to the GMP or an extension of the Contract Time due to Supplemental Information, unless permitted pursuant to Sections 4.7 and/or 4.8 of this Agreement.*

4.8.6   Change Orders.  Change Orders shall be in the form attached as **Exhibit "P"** to this Agreement.

4.8.6.4  A Change Order constitutes a full settlement, satisfaction and accord as to the adjustments, if any, in the Guaranteed Maximum Price and/or the Contract Time with respect to the change(s) in the Work and/or the Agreement that are described in the Change Order.

4.8.7   Change Directives.  Owner shall use a Change Directive (in the form attached [to the Agreement] as **Exhibit "Q"**) in the absence of total agreement between the Parties on the terms of a Change Order.

4.8.7.1  Upon receipt of a Change Directive, Contractor shall promptly proceed with the change in the Work directed in the Change Directive and promptly advise Owner of Contractor's agreement or disagreement with the method, if any, provided in the Change Directive for determining the proposed adjustment in the GMP or the Contract Time.

4.8.7.2  If Contractor disagrees with the proposed adjustment of the GMP and/or the Contract Time set forth in the Change Directive, then Contractor may assert a Claim in accordance with Section 4.7 of this Agreement.

Ex. 1 at §§ 1.2.7, 1.2.8, 1.2.22, 1.2.61, 2.3, 4.8.1, 4.8.3, 4.8.4, 4.8.6, 4.8.6.4, 4.8.7, 4.8.7.1, 4.8.7.2 (emphasis added).

      C.    <u>Delays, Contract Remedies for Delay and Contractor's Obligation to Present a Legitimate Claim as a Condition Precedent to Relief</u>

29.     In recognition of the importance of Contractor's agreement to Substantially Complete the Work within the Contract Time Work and for the Guaranteed Maximum Price, as well as the potential for delay to the Work, Owner and Contractor bargained over, and narrowly defined, the circumstances that would constitute an excusable or compensable delay to the Work

and entitle Contractor to assert a legitimate Claim for an extension of the Contract Time or an adjustment to the GMP, or both.

30.     The Parties agreed that a "Delay" was "[a] postponement in the performance of the Work that deviates from the Construction Schedule." Ex. 1 at §1.2.21.  The Parties also stipulated that only two types of Delays --- Owner Caused Delays and Unavoidable Delays --- would permit Contractor to present a legitimate Claim for contractual relief to Owner for its rejection or approval.  The Agreement states that an "Owner Caused Delay" is "[a] Delay *caused solely and directly* by an act or omission of Owner, Architect, or Owner's agents, employees, design professionals or Owner's separate contractors...", but that Delays caused by "[(i)] changes in the Work pursuant to Change Orders, [(ii)] correction or replacement of defective Work ordered by Owner, or [(iii)] Owner exercising its rights, obligations, responsibilities, or privileges under the Contract Documents, shall not be Owner Caused Delays." *Id*. at § 1.2.37 (emphasis added).

31.     The Agreement also specified Contractor's sole and exclusive remedy for an Owner Caused Delay and limited the circumstances, and extent, that Contractor could receive contractual relief for an Owner Caused Delay.  The Agreement states in Section 4.7.1.4 as follows:

> Contractor's *sole and exclusive remedy* for an Owner Caused Delay shall be payment of the actual additional General Conditions Costs set forth in **Exhibit "I"** that Contractor incurs as the sole and direct result of the Owner Caused Delay and an extension of the Contract Time, *but only to the extent that such Owner Caused Delay was the sole and direct result of a fact, circumstance, condition, act or event that prevented, or will prevent, Contractor from achieving Substantial Completion of the Work within the Contract Time.*  A Contract Time extension and Owner's payment of additional General Conditions Costs, to the extent allowed under this Section, *shall be Contractor's sole and exclusive remedy for any Owner Caused Delay, as well as for any (1) hindrance, disruption or obstruction in the performance of the Work relating to an Owner Caused Delay, (2) loss of productivity or efficiency relating to an Owner Caused*

> ***Delay, or (3) any other impact type claims relating to an Owner Caused Delay, whether or not any of the foregoing was, or is, foreseeable.***

Ex. 1 at § 4.7.1.4 (emphasis added).

32.     The remedy and limitations set forth in Section 4.7.1.4 applied to all Owner Caused Delays, as well as to all hindrances, disruptions, obstructions, losses of productivity, losses of efficiency, or any other type of impact relating to an Owner Caused Delay.

33.     The Agreement defines an "Unavoidable Delay," in Section 1.2.59, as follows:

> "[a] Delay which is caused solely and directly by events, circumstances or conditions beyond the control and without the fault or negligence of Contractor or its Subcontractors, Suppliers, employees, agents, and representatives and which Contractor is unable to prevent, mitigate or provide against with the exercise of reasonable diligence . . ."

Ex. 1 at §1.2.59.

34.     Similar to the definition of Owner Caused Delay, the definition of Unavoidable Delay has exceptions.  Specifically, that "Delays caused by labor disputes within or concerning the work force of, or provided by, Contractor, or its Subcontractors and Suppliers, [are] not [] Unavoidable Delays." *Id.*

35.     The Agreement also specified Contractor's sole and exclusive remedy for each Unavoidable Delay and also limited the circumstances, and extent, that Contractor could receive contractual relief for an Unavoidable Delay.  The Agreement states in Section 4.7.1.3 as follows:

> Contractor's sole and exclusive remedy for an Unavoidable Delay shall be as follows:
>
> (i) ***for the first thirty-five (35) days of Unavoidable Delays (excluding any Unavoidable Delays that are concurrent with a Delay caused by Contractor or its Subcontractors, Suppliers, or any other Person performing a portion of the Work through or under Contractor),*** Contractor's ***sole and exclusive remedy*** shall be an extension of the Contract Time, ***but only to the extent that such Unavoidable Delay was the sole and direct result of a fact, circumstance, condition, act or event that prevented, or will prevent, Contractor from achieving Substantial Completion of the Work within the Contract Time.***

Contractor shall not be entitled to payment of additional General Conditions Costs or any other compensation from Owner for costs incurred as a result of the first thirty-five (35) days of Unavoidable Delays. *Contract Time extensions, to the extent allowed under this Section, shall be Contractor's sole and exclusive remedy for the first thirty-five (35) days of Unavoidable Delays, as well as for any (1) hindrance, disruption or obstruction in the performance of the Work relating to such Unavoidable Delays, (2) loss of productivity or efficiency relating to such Unavoidable Delays, or (3) any other impact type claim relating to such Unavoidable Delays, whether or not any of the foregoing was, or is, foreseeable*; and

(ii)    for each day of Unavoidable Delay after the first thirty-five (35) days of Unavoidable Delay, Contractor's ***sole and exclusive remedy*** shall be payment of the actual additional General Conditions Costs set forth in **Exhibit "I"** that Contractor incurs as the sole and direct result of the Unavoidable Delay and an extension of the Contract Time, *but only to the extent that such Unavoidable Delay was the sole and direct result of a fact, circumstance, condition, act or event that prevented, or will prevent, Contractor from achieving Substantial Completion of the Work within the Contract Time. An extension of the Contract Time and Owner's payment of additional General Conditions Costs, to the extent allowed under this Section, shall be Contractor's sole and exclusive remedy for each day of Unavoidable Delay after the first thirty-five (35) days of Unavoidable Delays, as well as for any (1) hindrance, disruption or obstruction in the performance of the Work relating to such Unavoidable Delay, (2) loss of productivity or efficiency relating to such Unavoidable Delay, or (3) any other impact type claim relating to an Unavoidable Delay, whether or not any of the foregoing was, or is, foreseeable*.

Ex. 1 at § 4.7.1.3 (emphasis added).

36.     The remedy and limitations set forth in Section 4.7.1.3 applied to all Unavoidable Delays, as well as to all hindrances, disruptions, obstructions, losses of productivity, losses of efficiency, or any other type of impact relating to an Unavoidable Delay.

37.     Contractor also agreed that all Contract Time extensions are limited "only to the extent that the impact of the Unavoidable Delay or Owner Caused Delay, as the case may be, on the Work on the critical path of the CPM Construction Schedule cannot be eliminated or reduced by Contractor's re-sequencing of the Work or other measures that do not increase the Guaranteed Maximum Price." Ex. 1 at § 3.4.3.

38.     The Agreement also provided that Contractor is not entitled any contractual relief whatsoever for any Delays caused, in whole or in part, by the "acts, omissions, negligence, fault, default, or authorization of Contractor, a Subcontractor, Supplier or any employee, representative, or agent of any of them (or anyone else for whom Contractor is or may be responsible under the Contract Documents)," even if such Delays are concurrent with an Unavoidable Delay. *Id*. at §§ 4.7.1.5 & 4.7.1.6.

39.     The Agreement also dictates, and limits, Contractor's remedy for Owner Caused Delays that occur concurrently with Delay for which Contractor is responsible. The Agreement provides that in the event an Owner Caused Delay occurs concurrently with a Delay caused by the acts, omissions, negligence, fault, default, or authorization of Contractor, a Subcontractor, Supplier or any employee, representative, or agent of any of them, or any Person for whom Contractor is or may be responsible under the Contract Documents, then Contractor's remedy is limited to an extension of the Contract Time, but "only for that portion of the Delay which constitutes an Owner Caused Delay and only to the extent it prevented, or will prevent, Contractor from achieving Substantial Completion of the Work within the Contract Time" and Contractor is not entitled to receive any additional General Conditions Costs or (any other compensation) from Owner. *Id*. at § 4.7.1.7.

40.     As a condition precedent to Contractor's receipt of any contractual relief, Contractor was required to present Owner with a legitimate Claim for a valid, actionable Owner Caused Delay or Unavoidable Delay. The Agreement defines a "Claim," in relevant part, as "[a] demand or assertion by Owner or Contractor seeking an adjustment of Guaranteed Maximum Price or an adjustment in the Contract Time, or both, or other relief with respect to the terms of

the Contract Documents. . ."[11]   Ex. 1 at § 1.2.9.   As a condition precedent to any adjustment to

the Guaranteed Maximum Price or the Contract Time, Contractor was obligated to prepare, and

deliver to Owner, each of its legitimate and valid Claims in a contractually mandated format and

by a contractually imposed deadline.   The Agreement provides at Section 4.7 as follows:

4.7   Claims.

4.7.1.   Claims of Contractor.   Contractor shall prepare, and deliver to Owner, any Claim for an increase to the Guaranteed Maximum Price or an extension of the Contract Time in strict compliance with the terms, conditions and requirements [of] this Section 4.7.1.

4.7.1.1   Except for Claims for Owner Caused Delays or Unavoidable Delays, which Contractor shall prepare and deliver to Owner in accordance with Section 4.7.1.2 below, Contractor's Claims must be in writing and delivered to Owner no later than ten (10) days after Contractor knew, or reasonably should have known, of the circumstance, event, condition or act upon which the Claim is made.   If the Claim is based upon an unidentifiable or unforeseeable subsurface Site condition, then Contractor shall not change such condition, unless authorized by Owner in writing, until ten (10) days after Owner has received said Claim.   The Claim must state the follow: (i) the factual basis upon which the Claim is made; (ii) the date that Contract first knew of the event, condition, circumstances, or act giving rise to the Claim; (iii) the actual cost and time consequences of the condition, event, circumstance of act giving rise to the Claim; and (iv) the actual adjustment of the GMP requested by Contractor as the result of such condition, circumstance, event or act giving rise of the Claim.

4.7.1.2 Contractor shall prepare, and deliver to Owner, in writing (and in the form and with the content described herein), any Claim against Owner for either an Owner Caused Delay or an Unavoidable Delay as follows:

(i) no later than seven (7) days after the commencement of such Unavoidable Delay or Owner Caused Delay, as the case may be, Contractor shall provide to Owner written notification of the Unavoidable Delay or Owner Caused Delay that is the subject of the Claim and such written notification must include: (a) a description of the circumstance, event, condition, or act that caused such Unavoidable Delay or Owner Caused Delay, as the case may be; (b) the anticipated impact of the Unavoidable Delay or Owner Caused Delay, as appropriate, on the Work on the critical path of Contractor's CMP Construction Schedule; and (c) an estimate of the time and/or cost consequences (if

---

[11]   The Agreement excepts "[a] demand for money or services by a third-party" from the definition of Claim.  Ex. 1 at § 1.2.9.

appropriate) of the Unavoidable Delay or Owner Caused Delay as the case may be; and

(ii)  no later than twenty-five (25) days after the commencement of such Unavoidable Delay or Owner Caused Delay, as the case may be, which is the subject of the Claim and for which Contractor provided the written notification required pursuant to Section 4.7.1.2(i) above, Contractor shall prepare and provide to Owner a written time impact analysis stating:  (a) the factual basis upon which the Claim is made; (b) the date that Contractor first knew of the circumstance, event, condition or act that caused the Unavoidable Delay or Owner Caused Delay; (c) the date of commencement of such Unavoidable Delay or Owner Caused Delay; (d) a fragmentary network analysis illustrating the Unavoidable Delay's or Owner Caused Delay's, as the case may be, actual impact to the Work on the critical path of Contractor's CPM Construction Schedule; (e) the actual extension of the Contract Time requested by Contractor as a result of such Unavoidable Delay or Owner Caused Delay; and (g) the amount of the actual additional General Conditions Costs (set forth on **Exhibit "I"**) requested by Contractor as a result of the Owner Caused Delay or Unavoidable Delay, if permissible under this Section 4.7.1.

…

4.7.1.9    If a Claim is based upon restoration of damage to the Work caused by a fire or other casualty insured by the Builder's Risk Insurance (as defined herein) policy for the Project, then Contractor shall prepare and deliver the Claim in accordance with this Section 4.7.1 as well as the terms of the Builder's Risk Insurance policy.  The amount of such Claim shall be established as provided in Sections 4.8 and 13.1 below, subject to the other provisions of this Agreement.

…

4.7.1.12  Contractor shall not stop the Work pending the approval or rejection of a Claim, or during the pendency of any Claim, dispute or other controversy between Owner and Contractor.

41.    The Agreement also states that Contractor's failure to strictly comply with the Agreement's bargained for Claim presentation and delivery terms, conditions, and requirements is deemed a waiver of such Claims and any right to asset a Claim that Contractor may have had:

4.7.1.2  . . . Contractor's failure to provide a Claim for an Unavoidable Delay or an Owner Delay to Owner in compliance with this Section 4.7.1.2 (including its failure to provide the written notification set forth in Section 4.7.1.2(i) above) *shall deprive Contractor of Contractor's right to make a Claim for an extension of the Contract*

*Time, or additional General Conditions Costs (if due to an Owner Caused Delay) by reason of such Unavoidable Delay or an Owner Caused Delay, as the case may be.* Contractor's delivery of a Claim for an Unavoidable Delay or an Owner Caused Delay that complies with the requirements of this Section 4.7.1.2 shall not, in and of itself, establish the validity of the Claim or validity of the Unavoidable Delay or Owner Caused Delay that is the subject of the Claim.

   4.7.1.10   *Contractor hereby waives and releases any Claim that Contractor fails to prepare and deliver to Owner in compliance with the terms, conditions and requirements of this Section 4.7.1.*

Ex. 1 at §§ 4.7.1.2 & 4.7.1.10 (emphasis added).

   42.   Under the Agreement, adjustments to the Guaranteed Maximum Price or the Contract Time can only be made by Change Order.  *See* Ex. 1 at §§ 1.2.8 & 4.7.11.

   D.   <u>Owner's Remedy for Contractor's Failure to Achieve Substantial Completion within the Contract Time</u>

   43.   By executing the bargained for Agreement, the Parties agreed to liquidated Owner's damages for Contractor's material breach of the Contract for failing to achieve Substantial Completion within the Contract Time.  The Agreement provides at Section 3.7 as follows:

> Contractor recognizes that Owner will suffer financial loss if Contractor fails to achieve Substantial Completion of the Work within the Contract Time, plus any extensions thereof made in accordance with the Contract Documents.  The Parties expressly agree that the liquidated damages established, and agreed upon, in this Section 3.7 are not intended to penalize Cont[r]actor or induce performance by Contractor.  The liquidated damages established, and agreed upon, in this Section 3.7 are intended to compensate Owner for damages that are not readily ascertainable as of the Effective Date of this Agreement that Owner will incur if the Work is not Substantially Completed within the Contract Time, which include, but are not limited to, carrying charges, lost income, additional interest, taxes, lost income, and overhead and administration costs.  The Parties also recognize the delays, expenses, and difficulties that they will incur and encounter in any lawsuit arising out of this Agreement if Owner is required to prove in such lawsuit the actual damages Owner suffered due to Contractor's failure to achieve Substantial Completion of the Work within the Contract Time.  Accordingly, instead of requiring any such proof, if Contractor fails to Substantially Complete the Work prior to the expiration of the Contract Time, then Contractor shall pay to Owner, as liquidated damages (but not as a penalty) the following:

43

(i)      for each Unit included within the Work, an amount equal to Twenty-Five and 00/100 Dollars ($25.00) per Unit, per calendar day for the first thirty (30) calendar days, following the expiration of the Contract Time and Fifty and 00/100 Dollars ($50.00) per Unit, per calendar day for each and every calendar day thereafter until Contractor Substantially Completes the Units.   The per Unit liquidated damages in this Section 3.7(i) shall be assessed on a Unit-by-Unit basis for only those Units that Contractor fails to Substantially Complete prior to the expiration of the Contract Time; and

(ii)     for the Common Areas including within the Work, an amount equal to Five Hundred and 00/100 Dollars ($500.00) per calendar day for each and every calendar day following the expiration of the Contract Time until Contractor Substantially Completes the Common Areas.

. . .

The liquidated damages described in this Section 3.7 are not reimbursable expenses under the GMP, and as such, cannot be funded from Contractor's Contingency.   Contractor hereby waives all claims and defenses that the liquidated damages established, and agreed upon, herein are a penalty.   At Owner's sole and exclusive discretion, liquidated damages may be deducted from the unpaid portion of the GMP, including Retainage (as defined herein); . . . Any liquidated damages not so deducted from the unpaid balance of the GMP shall be immediately due and payable to Owner upon demand. This Section 3.7 shall survive Final Completion of the Work and any termination/cancellation of this Agreement.   The liquidated damages described in this Section 3.7 are Owner's sole remedy for Contractor's failure to achieve Substantial Completion of the Work within the Contract Time.

44.      The Contract Time expired on January 24, 2017 and Contractor has yet to achieve Substantial Completion of the Work.   Liquidated damages are accruing and will continue to accrue through and including the date that Contractor achieves Substantial Completion of the Work.

## II.      CONTRACTOR'S CONTRACT BREACHES

45.      The Agreement originally required Contractor to achieve Substantial Completion of the Work by January 19, 2017.  Owner and Contractor subsequently agreed, by Change Order Number 65788-0004 dated March 17, 2015, to extend the date for Substantial Completion of the Work of the Project from January 19, 2017 to January 24, 2017.   Thus, to comply with the

Contract, Contractor was required to achieve Substantial Completion of the Work within the Contract Time (*i.e.*, on or before January 24, 2017).

46.     Contractor failed to achieve Substantial Completion of the Work within the Contract Time. Contractor has also failed to achieve Substantial Completion of the Work as of the present date, which is over seven (7) months after the expiration of the Contract Time.  The failure of Contractor to achieve Substantial Completion of the Work within the Contract Time constitutes a material breach of the Agreement and triggers Contractor's obligation to pay Owner liquidated damages as provided in Section 3.7 of the Agreement.

47.     There are a number of reasons for Contractor's failure to achieve Substantial Completion of the Work within the Contract Time, including, but not limited to, those set forth in the paragraphs below.

> A.     Contractor's Failure to Staff and Supervise the Work as Required by the Contract

48.     The Agreement obligated Contractor to "furnish efficient business administration and adequately skilled employees, work places, materials, machinery, equipment and tools necessary to accomplish the Work in accordance with the Construction Schedule," and to "employ a competent superintendent, project manager, and necessary assistants who shall oversee the Work at the Project."  Ex. 1 at §§ 8.3.1 & 8.3.3.  The Agreement also obligates Contractor to assign to the Project particular employees of Contractor as the project executive, senior project manager, general superintendent, and project superintendent through Substantial Completion unless their employment with Contractor was terminated or if Owner consented to their removal from the Project.[12]  *See id.* at § 8.3.3 and Ex. O.  The Agreement further obligated

---

[12]     The Agreement provides in Section 8.3.3 that "Contractor's agreement that the individuals set forth on Contractor's Staffing Plan (attached hereto as **Exhibit "O"**) shall be and

Contractor to "ensure that sufficient personnel are employed at the Site in order to Substantially Complete the Work within the Contract Time in accordance with the. . . Contract Documents and for the Guaranteed Maximum Price. *Id.* at § 8.3.12.

49.     Contractor failed to furnish efficient business administration and adequately skilled employees, work places, materials, machinery, equipment and/or tools necessary to accomplish the Work in accordance with the Construction Schedule and the requirements of the Contract.

50.     Contractor failed to employ a competent superintendent, project manager, and necessary assistants to oversee the Work at the Project through Substantial Completion.  Among other things, Contractor failed to assign the agreed upon general superintendent identified in Exhibit O to the Agreement to the Project and the individual who Contractor ultimately did assign spent to this position most of his time at another project.  This individual was ultimately replaced by an individual who had never before served as a general superintendent on a project. The project executive agreed upon by the Parties in Exhibit O to the Agreement did serve in that capacity for a period of time, but after he left Contractor's employment, Contractor failed to place another individual in the role of project executive for over a year.  When Contractor finally secured a project executive, the individual – who lacked any experience working on a project similar to the Project – was unqualified and was terminated from his employment shortly thereafter. Similarly, the senior project manager that Owner bargained for and who was identified on Exhibit O to the Agreement was sent by Contractor to work on a different Project

---

remain the project manager and superintendent was a material inducement to Owner to enter this Agreement" and that "the individuals listed on Contractor's Staffing Plan shall remain assigned to the Project through Substantial Completion unless employment is terminated with Contractor or unless agreed to by Owner.  In such event, Contractor shall staff with position with personnel of equal experience and competence."

and did not perform the duties and responsibilities of a senior project manager at the Project. The individual placed in the role of senior project manager lacked the experience necessary for this position and was ultimately terminated.

51.     Turnover plagued Contractor's entire Project staff and the problems associated with this turnover and lack of continuity on the Project was compounded by Contractor's failure to assign staff to key positions.   By way of example only, three different individuals served, at different points in time, as the Project's mechanical, electrical and plumbing assistant project manager and this position has been unstaffed since July 2016.   The shell assistant project manager was terminated nearly two years before the shell (*i.e.*, the concrete superstructure of a building) was completed and Contractor allowed this position to remain unfilled through the completion of the shell.   The envelope assistant project manager left the project when less than 20 percent of the envelope (*i.e.*, the windows, balconies, and railings for a building) had been installed and, yet again, Contractor allowed this position to remain unfilled while the remaining 80-plus percent of the envelope was completed.   There have also been three different interior assistant project managers that have served, at various and different points of time, on the Project, leading to additional inefficiency and inconsistency on the part of Contractor.

52.     Contractor failed to perform the Work in a prompt and diligent manner, including failing to ensure that sufficient personnel are employed at the Site, in order to Substantially Complete the Work within the Contract Time.

B.    Contractor's Failure to Perform the Work in Accordance with the Contract Documents and in a Good and Workmanlike Manner

53.    The Agreement states that "Contractor shall perform all Work in a good and workmanlike manner in conformance with the best and modern trade practice and in strict conformance with the Contract Documents." *Id*. at § 8.9.1.

54.    Contractor has repeatedly failed to perform the Work in a good and workmanlike manner in conformance with the best and modern trade practice and in strict conformance with the Contract Documents.  For example, certain Work was faulty, defective or non-conforming and had to be redone, replaced, or otherwise repaired.  There was also damage to certain portions of Work that had been completed that was caused by the improper performance of other Work by Contractor and/or those individuals from whom Contractor is responsible.

55.    For example, on February 2, 2017, three elevators that serve and support more than two hundred forty (240) Units were virtually destroyed by water intrusion and flooding because a pump that Contractor procured and operated failed.  To make matters worse, Contractor has refused to repair the elevators until it receives applicable insurance proceeds.  Contractor currently estimates that the elevators will be restored to the condition and requirements of the Contract Documents sometime in late November 2017.  Hence, Contractor's pump failure, combined with its abandonment of its contractual obligation to promptly repair and correct the damage that it caused to the Work, will Delay Substantial Completion of more than two hundred forty (240) Units and portions of the Common Areas for more than ten (10) months.

C.    Contractor's Failure to Coordinate the Work, Failure to Timely Submit Shop Drawings and Failure to Timely Order Materials

56.    The Agreement requires Contractor to "review all Shop Drawings, Samples, Product data and other submittals to confirm that they comply with the Contract Documents prior

to Contractor submitting such submittals to Architect for review" and to "submit Shop Drawings, Product data, Samples and all other submittals to Architect for its review prior to Contractor performing the Work that is the subject of the submittals and sufficiently in advance" of performing the Work, "so as to avoid Delays in the Work."  *Id*. at § 8.1.5.  The Agreement also requires Contractor to coordinate the Work and the Work of its various Subcontractors before starting each portion of the Work.  *Id*. at § 8.1.2.  The Agreement states in Section 8.1.2 as follows:

> "Because the Contract Documents are complementary, Contractor shall, before starting each portion of the Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the information furnished by Owner pursuant to this Agreement, shall take field measurements of any existing conditions related to that portion of the Work, and shall observe any conditions at the Site affecting it. These obligations are for the purpose of facilitating coordination and construction by Contractor."

57.    Throughout the course of construction of the Work, Contractor routinely failed to comply with the Contract's provisions regarding Shop Drawings and submittals, by failing to properly review Shop Drawings and other submittals and failing to timely process and submit Shop Drawings and other submittals.   These Contract breaches delayed Contractor's procurement of materials and equipment, resulting in faulty and defective Work and caused significant Delays to the performance of the Work.

58.    Contractor also failed to coordinate the Work and adhere to the other requirements of Section 8 of the Agreement, which also resulted in faulty, defective and non-conforming Work that Contractor had redo, replace, correct and repair at great time and expense.

                    D.    Failure to Perform and Construct the Work in Compliance with Governmental Requirements

59.    The Agreement requires Contractor "to perform and construct the Work in strict compliance with Governmental Requirements," Ex. 1 at § 8.7, but Contractor has routinely failed

to do so causing damage to the Project, the Site and the Work, all of which must be corrected and/or repaired.

60.     By way of example, Contractor improperly, and in dereliction of the Florida Building Code and other Governmental Requirements, failed to use required and lawful sediment filtration equipment and methods while dewatering the Site and pumped sediment-saturated water into the Project's drainage wells, thereby destroying the drainage wells.  The Project and the Work have been damaged due to water intrusion and flooding because the drainage wells no longer discharge water from the Site at the rates that they did when they were initially constructed.  Contractor has been forced to redirect its Subcontractors from completing the Work to repairing and correcting damaged Work causing significant Delays to the Work.

### E.     Contractor's Failure to Protect the Work

61.     The Agreement obligates Contractor to "maintain the Site in clean condition at all times," "to protect the Work from damage by the weather and from damage caused by the performance of the Work. . . . to protect all other parts of the Project from damage by performance of the Work" and "to provide security measures to protect all Work in progress." *Id*. at §§ 8.13 & 8.14.

62.     Contractor has on several occasions throughout the construction of the Project failed to maintain the Site in clean condition, failed to protect the Work from damage by the weather and from damage caused by the performance of the Work, failed to protect all other parts of the Project from damage by performance of the Work, and failed to provide security measures to protect all Work in progress.  As a result of these Contract breaches, completed Work has been damaged by performance of the Work, weather and intentional misconduct on the part of Contractor (or individuals under its supervision).  For example, in September 2017, more

than twelve (12) Units, several elevators and most of the amenities on the fifth floor of the Project were significantly damaged by water due a leak from a dishwasher hose that Contractor installed.  The dishwasher hose was improperly installed by Contractor, Contractor damaged the hose when it installed and connected the dishwasher, the hose was damaged after it was installed, and/or the hose was intentionally severed by individuals under Contractor's supervision.

63.     Contractor compounded this breach by failing to promptly remove the damaged Work and remediate, restore and replace the Work to the condition required by the Contract, including Section 8.9.3 of the Agreement.

64.     The damage to the Work caused by Contractor's breaches – and the time Contractor will have to expend curing these breaches – are causes of Delay to Substantial Completion.

65.     Owner formally notified Contractor of its Contract breaches and demanded that Contractor cure them as required by the Contract.  Contractor did not cure (and, to date, has not cured) its material breaches of the Contract and is in default of the Contract.

**III.     CONTRACTOR'S SEVEN (7) "TIME IMPACT ANALYSES"**

66.     Rather than accept any responsibility for Contractor's failure to comply with the Agreement and Substantially Complete the Work within the Contract Time, Contractor submitted a total of seven (7) "Time Impact Analyses" or "TIAs" in which Contractor contends it is requesting an increase in the GMP of millions of dollars for additional General Conditions Costs and a total of a 310 day extension of the Contract Time (*i.e.*, through November 30, 2017).

a.   The document that Contractor has identified in the Complaint as TIA-1, which Contractor contends was submitted to Owner on February 8, 2016, is attached hereto as Exhibit 2.

b.   The document that Contractor has identified in the Complaint as TIA-2, which Contractor contends was submitted to Owner on July 8, 2016, is attached hereto as Exhibit 3.

c.   The document that Contractor has identified in the Complaint as TIA-3, which Contractor contends was submitted to Owner on October 5, 2016, is attached hereto as Exhibit 4.

d.   The document that Contractor has identified in the Complaint as TIA-4, which Contractor contends was submitted to Owner on January 8, 2017, is attached hereto as Exhibit 5.

e.   The documents that Contractor has identified in the Complaint as TIA-5 and TIA-6, which Contractor contends were submitted to Owner on February 28, 2017, are attached hereto as Exhibit 6.

f.   The document that Contractor has identified in the Complaint as TIA-7, which Contractor contends was submitted to Owner on July 25, 2017, is attached hereto as Exhibit 7.

67.     Contractor contends that the seven (7) TIAs, attached as Exhibits 2 through 7 hereto, are the only purported written requests for an extension of Contract Time or additional General Conditions Costs submitted by Contractor to Owner for any alleged Owner Caused Delays or Unavoidable Delay that Owner should have approved.

68.     By submitting these seven (7) TIAs, Contractor has effectively asserted that it is not responsible for even a single day of the nearly eight (8) month delay to the completion of the Project and that Contractor should be compensated for every single day that Contractor remains on the Project beyond the expiration of the Contract Time.

69.     The seven (7) TIAs that Contractor contends it submitted to Owner are not legitimate or viable claims and do not comply with the terms, conditions and requirements of the Contract that were bargained for by the Parties and which are set forth in the Agreement, and, as such, any purported Claim that is the subject of the TIAs has been waived and released by Contractor pursuant to the Agreement.

70.     Among other things, each TIA fails to present, preserve or otherwise advance any valid and legitimate Claims and, thus, were properly rejected by Owner because, among other things:

a.      The TIAs were not timely submitted to Owner and, thus, under the terms of the Agreement any Claim for an extension of Contract Time and/or additional General Conditions Costs was waived and released by Contractor, pursuant to Section 4.7.1.10 of the Agreement;

b.      The TIAs improperly compile multiple separate and unrelated alleged Owner Caused Delay or Unavoidable Delay, each allegedly caused by a separate, independent and unrelated event, but the contractually required information demonstrating that each event prevented, or will prevent, Contractor from achieving Substantial Completion of the Work within the Contract Time.   For example, TIA-1 requests an extension of the Contract Time in the amount of 88 days, TIA-2 requests a single extension of the Contract Time in the amount of 44 days, and, according to Contractor, TIA-3 requests a single extension of the Contract Time in the amount of 17 days;

c.      The TIAs failed to identify the impact of each purported Owner Caused Delay or Unavoidable Delay "on Work on the critical path of Contractor's CPM Construction Schedule"; and

d.   The TIAs failed to "include a fragmentary network analysis illustrating [each alleged Owner Caused Delay's or Unavoidable Delay's] actual impact to the Work on the critical path of Contractor's CPM Construction Schedule."

71.   By failing to comply with the heavily bargained over terms, conditions and requirements of the Agreement, Contractor has waived and otherwise released all remedies relating to any Owner Caused Delay and any Unavoidable Delay alleged in any of the seven (7) TIAs.

72.   By failing to Substantially Complete the Work within the Contract Time, Contractor has violated the terms of the Agreement and Owner is entitled to the remedies set forth in the Agreement, including liquidated damages.

## <u>COUNT ONE – BREACH OF CONTRACT</u>

73.   Owner restates and realleges paragraphs 1 through 72 of its Counterclaims as through fully set forth herein.

74.   Pursuant to the Contract, Contractor agreed to achieve Substantial Completion of the Work within the Contract Time.  The date for Substantial Completion of the Work was January 24, 2017 and Contractor failed to Substantially Complete the Work by this contractually agreed upon deadline.

75.   Contractor's failure to achieve Substantial Completion of the Work within the Contract Time constitutes a material breach of the Contract and entitles Owner to the remedies set forth in the Contract, including the liquidated damages provided for in Section 3.7 of the Agreement and attorneys' fees and costs as provided for in Section 21.4 of the Agreement.

76.     In addition to failing to achieve Substantial Completion of the Work within the Contract Time, Contractor also failed to perform other obligations under the Contract and has materially breached the Contract by, among other things and without limitation:

a.      failing to furnish efficient business administration and adequately skilled employees, work places, materials, machinery, equipment and tools necessary to accomplish the Work in accordance with the Construction Schedule;

b.      failing to employ a competent superintendent, project manager, and necessary assistants at all times to oversee the Work at the Project;

c.      failing to assign select individuals listed on Contractor's Staffing Plan to the Project through Substantial Completion;

d.      failing to ensure that sufficient personnel are employed at the Site in order to Substantially Complete the Work within the Contract Time;

e.      failing to perform the Work in a prompt and diligent manner;

f.      failing to perform all Work in a good and workmanlike manner in conformance with the best and modern trade practice and in strict conformance with the Contract Documents; and

g.      failing to protect the Work from damage by the weather and from damage caused by the performance of the Work, failing to protect all other parts of the Project from damage by performance of the Work, and failing to provide security measures to protect all Work in progress.

77.     As a direct, foreseeable and proximate result of Contractor's material breaches of the Contract, Owner has suffered harm.

WHEREFORE, Owner respectfully requests that judgment be entered in its favor and against Contractor and that Owner be awarded the liquidated damages and other remedies provided for in the Contract, including but not to the attorneys' fees and costs as provided for in Section 21.4 of the Agreement, as well as pre-judgment interest, post-judgment interest, and any other relief that the Court deems proper or just.

### COUNT TWO – DECLARATORY JUDGMENT

78.    Owner restates and realleges paragraphs 1 through 72 of its Counterclaims as through fully set forth herein.

79.    Contractor contends that through the seven (7) TIAs it "has requested time extensions totaling 310 calendar days, which would extend the Project's Substantial Completion date to November 30, 2017," and that Owner's rejection of the time extensions and additional General Conditions Costs purportedly requested in the seven (7) TIAs constitute a "material breach" of the Agreement by Owner.

80.    Owner contends that its rejection of the seven (7) TIAs, and the 310 calendar day extension of Contract Time and additional General Conditions Costs sought in those TIAs, do not, and cannot, constitute breaches of the Agreement because Owner was well within its rights under the Agreement to reject the TIAs insofar as none of the TIAs complied with the terms, conditions and requirements imposed by the Agreement, including those contained in Section 4.7 of the Agreement, and that any purported Claims arising out of the purported Owner Caused Delays or Unavoidable Delays alleged in the TIAs were waived and released by Contractor pursuant to the terms of the Agreement.  The seven (7) TIAs failed to satisfy the Agreement, and satisfy the conditions precedent to Owner's obligation to award the relief requested by the TIAs, and were rightly rejected by Owner because, among other things:

      a.     None of the TIAs are legitimate and valid Claims for an extension of the Contract Time and/or an increase in the Guaranteed Maximum Price (including additional General Conditions Costs);

      b.     the TIAs were not timely submitted to Owner;

      c.     the TIAs failed to identify the particularized impact of each purported Owner Caused Delay or Unavoidable Delay "on Work on the critical path of Contractor's CPM Construction Schedule";

      d.     the TIAs failed to "include a fragmentary network analysis illustrating [each of the alleged Owner Caused Delay's or Unavoidable Delay's] actual impact to the Work on the critical path of Contractor's CPM Construction Schedule";

      e.     the TIAs alleged Owner Caused Delays and/or Unavoidable Delays did not occur;

      f.     the TIAs alleged Owner Caused Delays and/or Unavoidable Delays that, if true, occurred concurrently with Delays caused by "caused by the acts, omissions, negligence, fault, default, or authorization of Contractor, a Subcontractor, Supplier, or any employee, representative, or agent of any of them (or anyone else for whom Contractor is or may be responsible under the Contract Documents)."

      g.     the TIAs sought extensions of the Contract Time that exceeded the "actual impact to the Work on the critical path of Contractor's CPM Construction Schedule"; and

      h.     the TIAs sought extensions of the Contract Time or the payment of additional General Conditions Costs for purported Owner Caused Delays or Unavoidable Delays that were "caused by the acts, omissions, negligence, fault, default, or authorization of

Contractor, a Subcontractor, Supplier, or any employee, representative, or agent of any of them (or anyone else for whom Contractor is or may be responsible under the Contract Documents)."

81.     Moreover, the seven (7) TIAs that are attached hereto as Exhibits 2-7 are the only purported written requests for an extension of Contract Time or additional General Conditions Costs submitted by Contractor to Owner for any alleged Owner Caused Delays or Unavoidable Delay that Contract contends that Owner should have approved.  Accordingly, if the Owner rightfully rejected the purported requests set forth in TIAs 1-7, then the Owner cannot be in breach of the Agreement for failing to grant an extension of the Contract Time or additional General Conditions Costs because a contractually compliant request for an extension of the Contract Time or an increase to the GMP is a condition precedent to a commensurate obligation upon the Owner to grant an extension of the Contract Time or an increase in the GMP for additional General Conditions Costs.  The Owner does not have an obligation to award Contractor that which it did not request.

82.     An actual controversy, therefore, exists between Owner and Contractor regarding Owner's rights and obligations with respect to the alleged requests for an extension of the Contract Time and additional General Conditions Costs set forth in TIAs 1-7 and the propriety of Owner's rejection of the same.

83.     As a result of this actual controversy, Owner stands in a position of uncertainty with respect to its rights and obligations with respect to the seven (7) TIAs' alleged requests for additional Contract Time and an increase in the GMP in the form of additional General Conditions Costs and the propriety of the Owner's rejection of the same.

84.     To resolve this actual controversy, Owner requests that the Court enter a declaratory judgment declaring the Parties' rights and obligations under the Contract vis-à-vis

the TIAs and the alleged requested Contract Time and additional General Conditions Costs. Specifically, Owner respectfully requests that the Court declare that (a) none of the seven (7) TIAS are legitimate Claims for an extension of the Contract Time or an increase to the Guaranteed Maximum Price; (b) the seven (7) TIAs do not satisfy the terms, conditions and requirements of the Agreement, including those in Section 4.7 of the Agreement, for presenting and preserving a legitimate and valid Claim for an increase to the Guaranteed Maximum Price (in the form of additional General Conditions Costs) or an extension of the Contract Time; (c) Owner had no contractual obligation pursuant to the Agreement to extend the Contract Time or increase the Guaranteed Maximum Price (in the form of additional General Conditions Costs) absent a contractually compliant and legitimate and valid Claim for an extension of the Contract Time or an increase in the Guaranteed Maximum Price; (d) Owner rightfully rejected each of the seven (7) TIAs pursuant to the Agreement and, therefore, did not breach the Agreement by rejecting all of the TIAs; (e) Owner cannot be in breach of the Agreement for failing to extend the Contract Time or increase the Guaranteed Maximum Price because TIAs 1-7 were rightfully rejected;  (f) Contractor waived any damages and other relief arising out of the purported delays set forth in TIAs 1-7 due to Contractor's failure to timely submit any legitimate and valid Claims in accordance with the terms, conditions, and requirements of the Agreement for those purported Owner Caused Delays or Unavoidable Delays; and (g) Contractor is in default of the Contract due to its failure to achieve Substantial Completion of the Work within the Contract Time, among other things.

## **PRAYER FOR RELIEF**

WHEREFORE, Owner respectfully prays that the Court:

a.     Enter and order and judgment in favor of Owner and against Contractor, awarding Owner all of the remedies and relief provided for in the Agreement as a result of the conduct described herein, including liquidated damages and attorneys' fees and costs;

b.     Enter an order and judgment declaring that (a) none of the seven (7) TIAS are legitimate Claims for an extension of the Contract Time or an increase to the Guaranteed Maximum Price; (b) the seven (7) TIAs do not satisfy the terms, conditions and requirements of the Agreement, including those in Section 4.7 of the Agreement, for presenting and preserving a legitimate and valid Claim for an increase to the Guaranteed Maximum Price (in the form of additional General Conditions Costs) or an extension of the Contract Time; (c) Owner had no contractual obligation pursuant to the Agreement to extend the Contract Time or increase the Guaranteed Maximum Price (in the form of additional General Conditions Costs) absent a contractually compliant and legitimate and valid Claim for an extension of the Contract Time or an increase in the Guaranteed Maximum Price; (d) Owner rightfully rejected each of the seven (7) TIAs pursuant to the Agreement and, therefore, did not breach the Agreement by rejecting all of the TIAs; (e) Owner cannot be in breach of the Agreement for failing to extend the Contract Time or increase the Guaranteed Maximum Price because TIAs 1-7 were rightfully rejected;  (f) Contractor waived any damages and other relief arising out of the purported delays set forth in TIAs 1-7 due to Contractor's failure to timely submit any legitimate and valid Claims in accordance with the terms, conditions, and requirements of the Agreement for those purported Owner Caused Delays or Unavoidable Delays; and (g) Contractor is in default of the Contract due to its failure to achieve Substantial Completion of the Work within the Contract Time, among other things;

c.      Award Owner its attorneys' fees and costs, pre-judgment and post-judgment interest; and

d.      Award Owner such other and further relief as is justified by the facts and the law, and as deemed just and proper by the Court.

Respectfully submitted, this 20th day of September, 2017, by:

GREENBERG TRAURIG, P.A.
333 Avenue of the Americas, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email:  thomasmic@gtlaw.com
barnettch@gtlaw.com
campl@gtlaw.com
smithgra@gtlaw.com

*/s/ Lindsey Reagan Camp*
MICHAEL J. THOMAS
Florida Bar No. 21309
LINDSEY REAGAN CAMP
Florida Bar No.: 84138
CHRISTOPHER L. BARNETT
Florida Bar No.: 0360510
GRAHAM M. SMITH
Florida Bar No. 107554

*Counsel for Defendant-Counterclaimant*
*PRH NE 31st Street, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2017, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on the counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Sean M. Dillon
Liana S. Madison
Moye, O'Brien, Pickert & Dillon, LLP
800 S. Orlando Ave.
Maitland, Florida 32751
sdillon@moopd.com
lmadison@moopd.com

*/s/ Lindsey Reagan Camp*
